LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
AMNON Z. SIEGEL (State Bar No. 234981)
asiegel@millerbarondess.com
LAUREN R. WRIGHT (State Bar No. 280809)
lwright@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 552-4400
Facsimile:    (310) 552-8400

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF AFRICAN AMERICAN–OWNED MEDIA, a California limited liability company; and ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> COMCAST CORPORATION, a Pennsylvania corporation; TIME WARNER CABLE, INC., a Delaware corporation; and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO. 2:15-cv-01239-TJH-MAN <br><br> **FIRST AMENDED COMPLAINT FOR RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981; AND FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

265091.7

FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400      FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    Plaintiffs National Association of African American–Owned Media

2    ("NAAAOM") and Entertainment Studios Networks, Inc. ("Entertainment Studios")

3    allege against Defendants Comcast Corporation ("Comcast"), Time Warner Cable,

4    Inc. ("Time Warner Cable"), and DOES 1 through 10, inclusive, (collectively,

5    "Defendants") as follows:

6                        **INTRODUCTION**

7        1.      This case is about racial discrimination in contracting by Defendants

8    Comcast and Time Warner Cable, two of the largest cable television companies in

9    the United States.  It involves refusals to contract and contracting on unequal and

10   discriminatory terms.

11       2.      Plaintiff Entertainment Studios is a 100% African American–owned

12   media company involved in the production and distribution of television

13   programming through broadcast television, its seven cable television channels, and

14   its subscription-based internet service.  It is the only 100% African American–

15   owned video programming producer and multi-channel operator/owner in the

16   United States (because the other 100% African American–owned media companies

17   have been shut out and were eventually forced out of business).

18       3.      Comcast and Time Warner Cable refuse to do business with truly

19   African American–owned media companies, including Entertainment Studios.

20   Instead, Comcast devised a strategy to shut out African American–owned media

21   companies and, in the process, bamboozled President Obama and the federal

22   government in the process.

23       4.      To that end, Comcast entered into a phony memorandum of

24   understanding ("MOU") with non-media civil rights groups, which it submitted to

25   the FCC in order to secure approval of its 2011 acquisition of NBC-Universal.  But

26   as set forth herein, the MOU actually did nothing to promote the inclusion of truly

27   African American–owned media companies in the media industry.  Quite the

28   opposite, Comcast has used the MOU against Entertainment Studios to perpetuate

1   its racial discrimination in contracting for channel carriage.

2       5.      After filing this lawsuit, Plaintiffs learned that they are not alone—

3   Comcast's racial discrimination has affected a number of other African American–

4   owned networks and channels.

5       6.      For example, Comcast's discriminatory contracting practices led to the

6   demise of Black Family Channel, a network that was created by renowned African

7   American attorney Willie E. Gary and other prominent African Americans,

8   including baseball legend Cecil Fielder, former heavyweight boxing champion

9   Evander Holyfield, Marlon Jackson of Jackson Five fame, and television executive

10  Alvin James.

11      7.      And after stringing along another 100% African American–owned

12  channel—Historically Black Colleges and Universities Network ("HBCU

13  Network")—Comcast pulled the plug on the carriage deal they had been negotiating

14  before the Comcast/NBC-Universal merger was approved in 2011.  Comcast told

15  HBCU Network that it could obtain carriage on Comcast's television distribution

16  system only via the "MOU Process"—an inherently unequal and discriminatory

17  track for minority-owned networks.  Other examples of Comcast's racial

18  discrimination in contracting for carriage abound and will be brought forth in

19  discovery in this action.

20      8.      Comcast and Time Warner Cable collectively spend approximately $25

21  billion annually for the licensing of pay-television channels and advertising of their

22  products and services ($20 billion licensing and $5 billion advertising), yet 100%

23  African American–owned media companies receive less than $3 million from these

24  companies per year.  This discrepancy is the result of—and evidences—racial

25  discrimination in contracting, in violation of the Civil Rights Act of 1866, 42 U.S.C.

26  § 1981.

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

**2**

FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**PARTIES, JURISDICTION AND VENUE**

**A.    Plaintiffs**

9.    Plaintiff NAAAOM is a California limited liability company, with its principal place of business in Los Angeles, California.

10.    NAAAOM was created and is working to obtain for African American–owned media the same contracting opportunities as their white counterparts for distribution, channel carriage, channel positioning and advertising dollars.  Its mission is to secure the economic inclusion of truly African American–owned media in contracting, the same as white-owned media.  NAAAOM currently has six members and, possibly, more in the offing.

11.    Historically, because of the lack of distribution/advertising support and economic exclusion, African American–owned media has been forced either to (i) give away significant equity in their enterprises, (ii) pay exorbitant sums for carriage, effectively bankrupting the business, or (iii) go out of business altogether, pushing African American–owned media to the edge of extinction.

12.    As alleged herein, Entertainment Studios—a member of NAAAOM— is being discriminated against on account of race in violation of 42 U.S.C. § 1981. Entertainment Studios thus has standing to seek redress for such violations in its own right.  The interests at stake in this litigation—namely, the right of African American–owned media companies to make and enforce contracts in the same manner as their white-owned counterparts—are germane to NAAAOM's purpose. Because NAAAOM seeks only injunctive relief, the individual participation of its members is not required.

13.    Plaintiff Entertainment Studios Networks, Inc. is a California corporation, with its principal place of business in Los Angeles, California. Entertainment Studios is a 100% African American–owned television production and distribution company.  It is the only 100% African American–owned video programming producer and multi-channel operator/owner in the United States.

14.     Entertainment Studios is certified as a bona fide Minority Business Enterprise as defined by the National Minority Supplier Development Council, Inc. and as adopted by the Southern California Minority Supplier Development Council.

15.     Entertainment Studios was founded in 1993 by Byron Allen, an African American actor/comedian/media entrepreneur.  Allen is the sole owner of Entertainment Studios.  Allen first made his mark in the television world in 1979, when he was the youngest comedian ever to appear on "The Tonight Show Starring Johnny Carson."  He thereafter served as the co-host of NBC's "Real People," one of the first reality shows on television.  Alongside his career "on-screen," Allen developed a keen understanding of the "behind the scenes" television business, and over the past 22+ years he has built Entertainment Studios as an independent media company.

16.     Entertainment Studios has carriage contracts with more than 40 television distributors nationwide, including VerizonFIOS, Suddenlink, RCN and CenturyLink.  These television distributors broadcast Entertainment Studios' networks to their combined 7.5 million subscribers.

17.     Entertainment Studios owns and operates seven, high definition television networks (channels), six of which were launched to the public in 2009 and one in 2012.  Entertainment Studios produces, owns, and distributes over 32 television series on broadcast television, with thousands of hours of video programming in its library.  Entertainment Studios' shows have been nominated for, and won, the Emmy award.  A copy of an Entertainment Studios promotional presentation highlighting key aspects of the company and the programming it produces is attached hereto as **Exhibit A**.

18.     In December 2012, Entertainment Studios launched "Justice Central," a 24-hour, high definition court/informational channel featuring several Emmy-nominated and Emmy-award winning legal/court shows.  After just two years, Justice Central has already proved itself a successful channel.  Justice Central has

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  boasted tremendous ratings growth across key television viewing periods and

2  demographics.

**B.    Defendants**

3

4      19.    Comcast Corporation is a Pennsylvania corporation, with its principal

5  place of business in Philadelphia, Pennsylvania.  Comcast also has an office, is

6  registered to do business and operates in Los Angeles, California.  Comcast is a

7  global media giant.  It owns NBC Television, Universal Pictures, Universal Studios,

8  multiple (approximately 30) pay television channels (*e.g.*, USA Network, Bravo

9  Network, E! Network, etc.), and it is one of the largest cable companies and internet

10  service providers in the United States.  Comcast provides subscription television

11  services to approximately 22 million subscribers—more than any other cable

12  television distributor in the United States.  It has near-monopolistic control over the

13  cable market in several major geographic markets across the United States.

14      20.    Time Warner Cable, Inc. is a Delaware corporation, with its principal

15  place of business in New York, New York.  Time Warner Cable also has an office,

16  is registered to do business and operates in Los Angeles, California.

17      21.    Plaintiffs are informed and believe, and on that basis allege, that

18  Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to

19  Plaintiffs for the wrongs alleged herein.  The true names and capacities, whether

20  individual, corporate, associate or otherwise, of Defendants DOES 1 through 10,

21  inclusive, are unknown to Plaintiffs at this time.  Accordingly, Plaintiffs sue

22  Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this

23  Complaint to allege their true names and capacities after they are ascertained.

**C.    Jurisdiction & Venue**

24

25      22.    This case is brought under a federal statute, § 1981 of the Civil Rights

26  Act; as such, there is federal question jurisdiction under 28 U.S.C. § 1331.  Venue of

27  this action is proper in Los Angeles because Defendants reside in this district, as

28  defined in 28 U.S.C. § 1391; and the acts in dispute were committed in this district.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**FACTS**

**A.    Racial Discrimination in the Media**

23.    Racial discrimination in contracting is an ongoing practice in the media industry with far-reaching adverse consequences.  It effectively excludes African American–owned media companies and African American individuals, and their diverse viewpoints, from the public airwaves.

24.    Major television channel distributors, like Comcast and Time Warner Cable, have unique power to limit the viewpoints available in the public media. Channel owners, like Entertainment Studios, are reliant upon the services of television distributors, like Comcast and Time Warner Cable, to provide access to their distribution platform not only to realize subscriber and advertising revenue, but also to reach television consumers themselves.

25.    Comcast and Time Warner Cable have control over television distribution on their cable platforms; their exclusion of African American–owned channels has resulted in the near-extinction of 100% African American ownership in mainstream media, and this exclusion is self-perpetuating.

26.    There is a statistic that highlights the inequity here:  Comcast's Chairman, Brian L. Roberts, was paid $32.9 million in compensation in 2014 alone—ten times more than all of Comcast paid to 100% African American–owned media for channel carriage and advertising combined during the same period. Additionally, the CEO of Time Warner Cable during the same period (2014) was paid approximately $34.6 million, again, more than ten times the amount all of Time Warner Cable paid to 100% African American–owned media for channel carriage and advertising.

27.    White-owned media in general—and Comcast in particular—has worked hand-in-hand with governmental regulators to perpetuate the exclusion of truly African American–owned media from contracting for channel carriage and advertising.  This has been done through, among other things, the use of "token

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

fronts" and "window dressing"—African American celebrities posing as "fronts" or "owners" of so-called "Black cable channels" that are actually majority owned and controlled by white-owned businesses.

28.     Comcast is a powerful political player in Washington, D.C. and has used its clout and money to obtain regulatory approval for its acquisitions and sweep its racist practices under the rug.  Comcast's chief lobbyist and executive vice president, David Cohen, is a major political fundraiser and the mastermind behind Comcast's conflicts of interest and wrongdoing recounted herein.

29.     Comcast influenced and secured favorable votes from government regulators—including Federal Communications Commission ("FCC") commissioner Meredith Attwell Baker—for approval of the Comcast/NBC-Universal transaction; and then hired Baker as an executive shortly after she cast her vote and approved the deal.  Comcast rewarded this government regulator with an executive position and a substantially higher salary after she used her power at the FCC to Comcast's benefit.  This executive position and compensation package would not have been granted by Comcast had Ms. Baker voted against the merger.

**B.    Comcast Enters into Sham Memoranda of Understanding with Non-Media Civil Rights Groups**

30.     In connection with its 2010 bid to acquire NBC-Universal, Comcast was criticized for its refusal to do business with independent and minority-owned media companies, including African American–owned media companies.  The Comcast/NBC-Universal merger was subject to regulatory approval by the FCC and the Department of Justice.

31.     Entertainment Studios and other minority-owned media companies opposed the merger, publicly criticizing Comcast for its failure to do business with African American–owned media companies.  Entertainment Studios urged the FCC to impose merger conditions that would address Comcast's discriminatory practices in contracting for channel carriage.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

32.     When Comcast's racist practices and policies jeopardized the approval of the NBC-Universal acquisition, Comcast manipulated ways to secure merger approval while perpetuating its exclusion of African American–owned channels.  In order to gain approval of its acquisition of NBC-Universal, Comcast gave millions in monetary "contributions" to various non-media minority special interest groups in order to "buy" support for its expansion.

33.     Comcast "donated" funds to at least 54 different groups that went on publicly to endorse the Comcast/NBC-Universal deal.  And after buying their support, Comcast entered into what it termed "voluntary diversity agreements," *i.e.*, memoranda of understanding ("MOUs"), with non-media civil rights groups, including NAACP, National Urban League and Al Sharpton's National Action Network.  These non-media civil rights groups are not television channel owners and do not operate in the television channel business.  They do not produce original television programming, or operate television channels, unlike Entertainment Studios, which does both.

34.     Through the MOUs, Comcast purported to address the widespread concerns regarding the lack of diversity in channel ownership on its systems by, among other things, committing to launch several new networks with minority ownership and establishing "external Diversity Advisory Councils" to advise Comcast as to its "diversity practices," including in contracting for carriage.  The MOUs were a smokescreen designed to secure merger approval without obligating Comcast to do business with truly African American–owned media companies.

35.     Each of the signatories to the MOU between Comcast and the "African American Leadership Organizations" were paid by Comcast in the time leading up to the Comcast/NBC-Universal deal.  Comcast paid $30,000 to the NAACP, $835,000 to the National Urban League, and $140,000 to Al Sharpton's National Action Network.  Comcast also paid hundreds of thousands of dollars to the National Urban League's various regional affiliates.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

8

36.     Comcast has also paid Reverend Al Sharpton and Sharpton's National Action Network over $3.8 million in "donations" and as salary for the on-screen television hosting position on MSNBC that Comcast awarded Sharpton in exchange for his signature on the MOU.  Despite the notoriously low ratings that Sharpton's show generates, Comcast allows Sharpton to maintain his hosting position for more than three years in exchange for Sharpton's continued public support for Comcast on issues of diversity.

37.     Comcast paid Sharpton so that he would publicly endorse the NBC-Universal deal and divert attention away from Comcast's racial discrimination in contracting.  In exchange, Sharpton's National Action Network and other non-media minority interest groups supported Comcast before the FCC with very little understanding about the merger or expertise in the media business.

38.     The MOUs were given the appearance of legitimacy because they were approved by minority interest groups—NAACP, National Urban League, and Al Sharpton's National Action Network, none of which own or operate any television channels, and all of which accepted large donations/pay-offs for their signatures.

39.     Ironically, as reported in *The New York Times*, Comcast spent millions of dollars to pay non-media civil rights groups to support its acquisition of NBC-Universal, while at the same time refusing to do business with African American–owned media companies.  These payments were a ruse made with an ulterior motive:  To make Comcast look like a good corporate citizen while it steadfastly refused to contract with African American–owned media companies.

40.     The MOU was signed by Comcast's then–Executive Vice President and Chief Diversity Officer David Cohen.  Mr. Cohen was integral in structuring and getting the Comcast / NBC-Universal merger approved, including by acting as one of the main architects of the (phony) MOU.  On information and belief, Mr. Cohen also oversees and signs off on the Annual Compliance Reports that Comcast submits to the FCC, in which Comcast misleadingly claims to be doing business with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

African American owned-and-operated channels when, in fact, the channels Comcast has launched pursuant to the MOU are owned, controlled and backed by white-owned media and money.

41.     The "Diversity Advisory Councils" Comcast established are also shams.  Not only do the Council members have limited understanding of the cable industry and little-to-no experience operating cable networks, but Comcast has not given the Council any real authority to "advise" Comcast as to its diversity initiatives in contracting for carriage.  Instead, Comcast gave the Council a standard tour of its offices, and never even asked its members about channel carriage.

**C.** **Comcast Uses the MOU to Discriminate Against Media Companies with Truly "Majority or Substantial" African American Ownership**

42.     In light of the concerns about Comcast's failure to do business with independent, minority-owned media companies, Comcast had a problem.  The sham MOUs solved it:  Through the MOUs, Comcast purportedly agreed to enter into carriage agreements with minority-owned media companies; but the channels that were ultimately launched were fronts and were not truly minority-owned.

43.     Through the MOU with the African American non-media civil rights organizations, Comcast purportedly agreed to enter into carriage agreements to distribute programming networks in which African Americans have "**majority or substantial**" ownership interest and to add these networks on commercially comparable and competitive terms.

44.     But Comcast has done just the opposite.  Comcast has used the MOU to facilitate its racist practices and policies in contracting—or, more accurately, refusing to contract—with media companies with truly "majority or substantial" African American ownership.  It has not contracted with majority or substantially owned African American media.  The MOU is a sham.

45.     With the MOU in hand, Comcast proceeded to segregate media businesses with "majority or substantial" African American ownership by creating

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

two separate paths for contracting for channel carriage: one for non-minority-owned channels and a separate, but not equal, process for African American–owned channels (the "MOU Process").

46.   The MOU Process is distinctly unequal from Comcast's normal process for contracting for carriage.  Comcast limits the number of carriage agreements it will enter into through the MOU Process and offers inferior contracting terms.  The MOU thus furthers Comcast's discriminatory practices against African American–owned channels.  Comcast has used the MOU to create a segregated and unequal path for African American–owned channels to contract for carriage.

47.   By relegating companies with "majority or substantial" African American ownership to the MOU Process, Comcast affords them inferior or no contracting opportunities.  By contrast, media companies without "majority or substantial" African American ownership are able to contract with Comcast for carriage at any time via Comcast's normal process for contracting for carriage.

48.   Comcast refuses to contract with African American–owned media companies—such as Entertainment Studios—through its normal contracting process.  African American–owned channels are thus being denied the same opportunity to contract with Comcast as channels without majority or substantial African American ownership.  The MOU Process constitutes intentional discrimination.

49.   In addition to these racial restrictions, African American–owned media companies face further inequities in the terms and conditions Comcast offers to the channels it chooses through the MOU Process.  Comcast has offered shorter-term deals and little, if any, in licensing fees to the channels it launches through the MOU Process.  These less favorable contracting terms make it difficult—if not impossible—for the channels launched through the MOU Process to succeed.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**D.**     **In Violation of the MOU, Comcast Has Not Launched Any Independent Networks with "Majority or Substantial" African American Ownership**

50.     The "diversity" commitments Comcast made through the MOU are fraudulent.  The MOU was purportedly intended to result in the launch of so-called "minority-owned" networks—*i.e.*, networks "in which African Americans have a **majority or substantial** ownership interest."  In reality, the networks Comcast has launched pursuant to the MOU are owned, controlled, and backed by white-owned media and money.  Comcast has given African American celebrities token ownership interests in those channels to serve as figureheads in order to cover up its racial discrimination in contracting.

51.     For example, one of the supposedly "Black channels" Comcast launched—*REVOLT*—is actually owned by Highbridge Capital, which is run by a former Comcast executive who reported directly to David Cohen, Payne Brown.  Highbridge Capital is also a subsidiary of JP Morgan, whose Board of Directors includes Comcast's President and COO, Steve Burke.  The other supposed "Black channel" Comcast launched—*Aspire*—is actually owned by Intermedia Partners, which is owned/controlled by white businessman Leo Hindery, a long-time friend of Comcast's CEO, Brian Roberts.

52.     Although Comcast touts *REVOLT* and *Aspire* as satisfying its MOU commitments, neither is a network with truly "**majority or substantial**" African American ownership.  These networks give African American celebrities token ownership interests but, in reality, are owned and operated by Comcast insiders.

53.     The only channel with "majority or substantial" African American ownership that Comcast has launched—*The Africa Channel*—is owned and operated by a Comcast insider, Paula Madison.  Madison is a former Comcast/NBC-Universal executive and oversaw the execution of the MOU.

54.     In other words, aside from a channel that is owned and operated by the former Comcast/NBC-Universal executive who co-authored the MOU, Comcast has

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1  not launched a single channel with majority or substantial African American

2  ownership—by way of the MOU or otherwise.

3       55.    Comcast made similar "diversity commitments" to the Hispanic

4  community in order to secure approval of its bid to acquire NBC-Universal.  But

5  again, rather than launching any truly Hispanic-owned channels, Comcast launched

6  "Baby First Americas"—a non-Hispanic-owned channel (the channel's founders,

7  owners and operators are Guy Oranim and his wife, Sharon Rechter, who are

8  Israeli).  Bill Burke—brother of Comcast's President and COO, Steve Burke—is on

9  the Board of Directors of Baby First Americas.

10  **E.**    <u>**Comcast and Time Warner Cable Refuse to Contract with**</u>

11      <u>**Entertainment Studios on the Basis of Race**</u>

12       56.    Entertainment Studios, a 100% African American–owned media

13  company, has been shut out from doing business with Comcast despite significant

14  efforts to do so.  Like many other African American–owned channels that have tried

15  to secure cable carriage during Comcast's 50+ year history, Entertainment Studios

16  has had multiple meetings for channel carriage with Comcast but, like the others, to

17  no avail.  Comcast has discriminated against Entertainment Studios at every turn.

18       57.    Entertainment Studios has been trying for several years to contract with

19  Comcast for carriage of one or more of Entertainment Studios' seven channels.

20  Comcast has refused and strung Entertainment Studios along.  Comcast has given

21  Entertainment Studios the false impression that its channels are on Comcast's "short

22  list" and provides a variety of different excuses for its refusal to carry any of

23  Entertainment Studios' channels, even though the channels are widely viewed on

24  Comcast's competitors' television distribution systems.

25       58.    Comcast has been playing a game of "whack-a-mole" with

26  Entertainment Studios—each time Entertainment Studios jumps a pretextual hurdle

27  created by Comcast (*e.g.*, Comcast executive, Jennifer Gaiski, required

28  Entertainment Studios to present empirical data and secure support "in the field" so

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   that she could present such material to Comcast senior management, Greg Rigdon

2   and Neil Smit), Comcast replaces it with a new obstacle.  Although Entertainment

3   Studios has complied with each of Comcast's demands, Comcast still refuses to

4   launch any of Entertainment Studios' channels.

5        59.    For example, Comcast Corporate directed Entertainment Studios to

6   garner support from Comcast's Division offices in order to bolster its carriage

7   request.  But when Entertainment Studios reached out to the different Divisions

8   (Northeast, Central and West), the Divisions indicated that they "deferred to

9   Corporate."

10        60.    Comcast Corporate also emphasized the need for feedback from the

11   Regions.  But again, when Entertainment Studios received support from key

12   Comcast Regions (*e.g.*, Chicago, Southwest), Comcast Corporate nevertheless

13   denied carriage.  In some cases, Entertainment Studios was inconsistently advised

14   *not* to meet with the Regions because all carriage decisions were funneled through

15   Comcast Corporate.  Comcast required Entertainment Studios to run around in

16   circles—and spend hundreds of thousands of dollars on travel and expenses—

17   without any intention of considering a carriage deal.

18        61.    Comcast has used other phony excuses to justify its racial

19   discrimination.  For example, it claims that it does not have the bandwidth to

20   accommodate Entertainment Studios' channels or that it is not a buyer of new

21   channels.  But meanwhile, Comcast has entered into carriage agreements with other

22   non-minority-owned channels, belying its various pretextual excuses.

23        62.    Comcast also claims that it is interested in adding carriage only for

24   news and sports channels.  This is yet another phony excuse.  Comcast has added

25   other, non-news, non-sports channels while simultaneously refusing to contract with

26   Entertainment Studios and turning down another 100% African American–owned

27   channel focused on black college sports, HBCU Network.

28

63.   Comcast further claims that there is no demand for Entertainment Studios' channels, but that, too, is belied by the facts:  Entertainment Studios' channels have a proven track record of high ratings and popularity among viewers and are distributed by other national television providers.  Entertainment Studios' programming has garnered Emmy nominations and wins.  Entertainment Studios sells its channels to dozens of other programming distributors and television stations, which distribute Entertainment Studios' channels to millions of subscribers.

64.   For example, one of Entertainment Studios' most recently launched channels, Justice Central, has achieved success in the short time it has been on the air.  Justice Central's double- to triple-digit ratings growth outperformed the vast majority of networks that Comcast and Time Warner Cable pay substantial license fees to carry.  Indeed, between the first quarter of 2013 and the fourth quarter of 2014, Justice Central boasted huge ratings growth on AT&T's television platform, as follows:

Justice Central – AT&T U-Verse Ratings Growth

| Daypart: | Air Time: | % Growth 1st Qtr. 2013 to 4th Qtr. 2014: |
|---|---|---|
| Early Fringe | 4-7pm | +38% |
| Prime Access | 7-8pm | +21% |
| Prime | 8-11pm | +53% |
| Late Fringe | 11pm-2am | +552% |
| Overnight | 2-6am | +295% |

65.   Entertainment Studios even offered for Comcast to launch Justice Central *for free*, but Comcast still insisted that Entertainment Studios proceed via the MOU Process in its attempts to obtain carriage.  This is evidence that Comcast's decision is based on racial animus and retaliation for Entertainment Studios' opposition to the Comcast/NBC-Universal merger, rather than legitimate business considerations.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

66.     Entertainment Studios did not know that Comcast was using the MOU as a vehicle to perpetuate racial discrimination in contracting until recently.  In November 2014, Entertainment Studios first discovered that Comcast had set up dual paths for negotiating for carriage (one for non-minority-owned media and one for African American–owned media) when it was told by Comcast that it would be relegated to the MOU Process.  These two paths for carriage are separate, but not equal—the very definition of discrimination.

67.     Comcast has admitted that it is "impressed" by Entertainment Studios' programming and channels, but has excluded Entertainment Studios from obtaining carriage through Comcast's normal contracting process.  Instead, Comcast has forced this 100% African American–owned media company to apply for carriage through the "MOU Process."

68.     For example, in November 2014, a Comcast executive told Entertainment Studios that although its channels were good enough for carriage on Comcast's platform, Entertainment Studios would have to wait to be part of the "next round of [MOU] considerations."

69.     In other words, Comcast told Entertainment Studios that it would consider contracting to carry Entertainment Studios' channels only to the extent that the carriage agreement would satisfy Comcast's obligation to launch networks with "majority or substantial" African American ownership pursuant to the MOU.  But as described above, the MOU Process has never resulted in the launch of channels with truly "majority or substantial" African American ownership.

70.     Comcast has, in essence, created a "Jim Crow" process with respect to licensing channels from media companies with "majority or substantial" African American ownership.  Comcast has reserved a few spaces for African American–owned media companies in the "back of the bus," while the rest of the bus is occupied by non-African-American-owned media companies.  This is racial discrimination in contracting.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

71.     Entertainment Studios is restricted to applying for carriage with Comcast via the MOU Process not because of the nature of its channels—which are broad market with global appeal—but because it is African American–owned.  For racial reasons alone, Entertainment Studios is forced to participate in a discriminatory process.  This is racial discrimination in contracting, in violation of 42 U.S.C. § 1981.

72.     The MOU enables Comcast to tout a phony, non-existent "commitment" to racial diversity.  All the MOU has done is allow Comcast to "legitimize" its racist policies and practices so it can continue to refuse to do business with African American–owned media companies.

73.     According to Comcast, Entertainment Studios must go through the MOU Process for obtaining channel carriage.  This prevents Entertainment Studios from being treated equally with its non-minority-owned/controlled counterparts.

74.     These are violations of § 1981:  Comcast's refusal to contract with media companies with majority or substantial African American ownership; its implementation of dual paths for carriage (*i.e.*, one path for non-minority-owned media and a separate "MOU Process" for African American–owned media companies); its discrimination in the contractual terms it offers to African American–owned media companies; and its pretextual excuses for refusing to contract.

75.     Comcast's discriminatory intent is further evidenced by the fact that of the approximately $10 billion in content fees that Comcast pays to license channels and advertise each year, less than $3 million is paid to 100% African American–owned media.  The payments Comcast makes to African American–owned media companies are tokens and a charade.  Comcast pays minimal amounts to license and distribute the Africa Channel, which is owned and operated by a former Comcast/NBC-Universal executive/insider, Paula Madison, one of the architects of the MOU Comcast uses to perpetuate its racial discrimination in contracting.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

76.     Time Warner Cable likewise refuses to contract with Entertainment Studios on the basis of race.  Outside of a single channel (Africa Channel) that is owned and operated by the former Comcast executive, Time Warner Cable does not distribute any channels that are owned and operated by 100 % African American–owned media companies either.

77.     In the time leading up to the then-pending merger between Comcast and Time Warner Cable, Entertainment Studios had made progress negotiating the terms of a possible carriage deal with Time Warner Cable.  But then Comcast programming executive, Jennifer Gaiski, asked who Entertainment Studios was in discussions with at Time Warner Cable about launching its channels.

78.     Entertainment Studios disclosed that it had advanced negotiations with Time Warner Cable executive, Melinda Witmer (who was presenting Entertainment Studios' information to Time Warner Cable President and COO, Robert Marcus). Soon thereafter, Entertainment Studios' channel launch opportunity was shut down by Time Warner Cable under orders from Comcast.

79.     Thus, in the face of the then-pending pending merger between Comcast and Time Warner Cable, Time Warner Cable delegated channel carriage decision-making to Comcast—"gun jumping" the consummation of the Comcast / Time Warner Cable merger in violation of federal law.  Time Warner Cable thus adopted Comcast's racist policies and practices in connection with refusing to contract with Entertainment Studios.

80.     Entertainment Studios is being discriminated against on account of race in connection with contracting in violation of the Civil Rights Act.  Without access to viewers and without licensing fees and advertising revenues from the largest video programming distributors in the country, this 100% African American–owned media business is being shut out and severely damaged, like all other truly African American–owned media networks.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**F.**   **Comcast's History of Racial Discrimination Against African American–Owned Media Companies**

81.   Comcast's discrimination against Entertainment Studios, as detailed herein, is part and parcel of a pattern of racial discrimination this media giant has perpetrated for decades.  Indeed, Comcast cannot identify a single independent 100% African American–owned network that it has distributed on its television platform in its 50+ years of operation.  As set forth below, Comcast has historically discriminated against African American–owned media companies in contracting for channel carriage in favor of media companies that are owned and operated by white Comcast cronies.

**Black Family Channel**

82.   Entertainment Studios is not the first African American–owned media company to contemplate legal action against Comcast for its blatant racial discrimination in contracting.  Another is MBC Network (later known as Black Family Channel), which threatened to sue Comcast for its racial discrimination in contracting—even going so far as to draft a lawsuit alleging violations of 42 U.S.C. § 1981, the same claim asserted herein.

83.   Black Family Channel was founded by renowned African American attorney Willie E. Gary and other prominent African American entrepreneurs, including baseball legend Cecil Fielder, former heavyweight boxing champion Evander Holyfield, Marlon Jackson of Jackson Five fame, and television executive Alvin James.

84.   From its launch in 1999 until 2002, the Black Family Channel was distributed to millions of viewers on Comcast's television system.  Beginning in 2002, however, Comcast informed Black Family Channel that to guarantee continued carriage on Comcast's systems, Black Family Channel would need to give Comcast a significant ownership interest in the company.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

19

85.     When Black Family Channel refused, Comcast began retaliating and discriminating against this 100% African American–owned media company. Comcast halted the expansion of Black Family Channel in new markets; placed Black Family Channel on a more expensive, less-penetrated, less-favorable program tier; and gave Black Family Channel inferior channel positioning.  Comcast additionally withdrew advertising opportunities from Black Family Channel, eliminating an important revenue source for the network.

86.     Comcast deliberately discriminated against Black Family Channel in contracting for carriage on the basis of race.  Indeed, Comcast did not require similarly situated, white-owned networks to give Comcast an ownership interest in their networks in order to secure carriage on favorable, non-discriminatory terms.

87.     As a result of Comcast's discrimination, Black Family Channel was denied increased carriage and licensing fees, leading to the network's demise.  The network was eventually sold to Gospel Music Channel, a network that was financially backed and controlled by white businessman Leo Hindery.  (Due to Comcast's discrimination and concomitant limited distribution of Black Family Channel, the network was undervalued and sold for less than $10 million.)

88.     After Black Family Channel was taken over by a white businessman, Comcast rolled out the red carpet for the network:  Comcast agreed to enter into a carriage agreement with Gospel Music Channel and to broadly distribute the network on its cable platform.  Today, Leo Hindery is undertaking efforts to sell the network (now called Up TV) for approximately $550 million—in other words, Black Family Channel's value has increased more than 50-fold by virtue of Comcast's newfound willingness to do business with the network now that it is white-owned.

**HBCU Network**

89.     Comcast also discriminated on the basis of race in its dealings with Historically Black Colleges and Universities ("HBCU") Network, another African

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

American–owned network.  HBCU Network is a sports, entertainment and lifestyle network devoted to historically black colleges and universities.  It was created by two African American media entrepreneurs, Curtis Symonds and Clint Evans.  Mr. Symonds is a cable industry veteran—he was an executive at ESPN for eight years and served as Executive Vice President, Distribution and Marketing for BET Networks for more than 14 years.  HBCU Network pledged to give back to the black colleges and universities by partnering with them and sharing in the network's ownership and profits.

90.     Mr. Symonds has detailed Comcast's discriminatory dealings with HBCU Network in writing, as follows:  HBCU Network met with Comcast's then–Senior Vice President of Programming, Madison Bond, and his executive team to negotiate a carriage agreement.  Comcast told Mr. Symonds that it was excited about the network and, soon after the meeting, Comcast offered HBCU Network a 20-year carriage deal, including license fees.

91.     As HBCU Network was moving forward to finalize the terms of its carriage deal, Comcast pulled the rug out from under the network:  Comcast told HBCU Network that in light of the merger between Comcast and NBC-Universal, Comcast was required to launch a certain number of minority-owned networks and even though HBCU Network had been at a very advanced stage of negotiations for carriage, it would need to start over and proceed via the application process for minority-owned networks (*i.e.*, the "MOU Process" described herein).

92.     In other words, because—and only because—HBCU Network was an African American–owned network, it was forced to proceed via the MOU Process rather than finalizing the carriage deal that had already been underway through Comcast's normal contracting process.

93.     Instead of launching HBCU Network via the MOU Process, Comcast turned them away completely.  After Comcast had (purportedly) satisfied its MOU commitment, it was unwilling to do business with this 100% African American–

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  owned network.

2      **Soul Train**

3      94.    "Soul Train" is an iconic African American–owned television series

4  created by the late Don Cornelius, a successful African American television

5  producer.  Like Black Family Channel and HBCU Network, Comcast also refused to

6  do business with Don Cornelius Productions, a 100% African American–owned

7  media company that wanted to launch a Soul Train network.  Comcast shut them

8  out, forcing them to sell the Soul Train franchise to the same white businessman,

9  Leo Hindery, who bought the Black Family Channel at a steep, below-market

10  discount.

11      **FIRST CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS**

12      **(42 U.S.C. § 1981)**

13  **NAAAOM and Entertainment Studios Against Comcast & Time Warner Cable**

14  **A.    Section 1981**

15      95.    NAAAOM refers to and incorporates by reference each foregoing and

16  subsequent paragraph of this Complaint as though fully set forth herein.

17      96.    Comcast and Time Warner Cable have engaged in, and are engaging in,

18  pernicious, intentional racial discrimination in contracting, which is illegal under

19  § 1981.  Section 1981 is broad, covering "the making, performance, modification,

20  and termination of contracts, and the enjoyment of all benefits, privileges, terms,

21  and conditions of the contractual relationship."

22      97.    African Americans are a protected class under Section 1981.

23  Entertainment Studios is a 100% African American–owned media business.

24      98.    As alleged herein, Entertainment Studios attempted many times over

25  many years to contract with Comcast and Time Warner Cable to carry its channels,

26  but these television distributors have refused, providing a series of phony, pretextual

27  excuses.  Yet Comcast and Time Warner Cable have continued to contract with—

28  and make themselves available to contract with—similarly situated white-owned

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    television channels.

2        99.    Comcast has refused to contract with Entertainment Studios for channel

3    carriage and advertising.  Entertainment Studios has been deprived of the right to

4    contract with Comcast by being relegated to the MOU Process, while non-minority-

5    owned businesses have been afforded the right to contract with Comcast through its

6    normal, more accessible process.

7        100.   Comcast has dealt with Entertainment Studios and other African

8    American–owned media companies in a markedly hostile manner and in a manner

9    which a reasonable person would find discriminatory.  Comcast has a pattern and

10   practice of refusing to do business with, or offering unequal contracting terms to,

11   African American–owned media companies.

12       101.   Time Warner Cable has likewise refused to contract with Entertainment

13   Studios for channel carriage and advertising.  In the face of the then-pending merger

14   between Comcast and Time Warner Cable, Time Warner Cable delegated channel

15   carriage decision-making authority to Comcast.  Accordingly, Time Warner Cable

16   engaged in the same discriminatory conduct as Comcast.  Time Warner Cable

17   adopted Comcast's racist policies and practices in connection with contracting for

18   channel carriage.  After Comcast demanded to know who Entertainment Studios

19   was talking to at Time Warner Cable to get channel carriage, Time Warner Cable

20   closed the door (at the instruction of Comcast) on negotiations and shut out

21   Entertainment Studios.

22   **B.**    **Damages**

23       102.   But for Comcast's and Time Warner Cable's refusal to contract with

24   Entertainment Studios, Entertainment Studios would receive approximately $378

25   million in annual license fees for its seven channels—calculated using a

26   conservative license fee of fifteen cents per subscriber per month for each channel

27   for Comcast / Time Warner Cable's combined 30 million subscribers.  If Defendants

28   contracted in good faith, Entertainment Studios would also receive an estimated

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  $200 million per year, per channel, in national advertising sales revenue, or a total

2  of $1.4 billion per year, equaling a combined total of $1.8 billion in annual revenue.

3    103.   Combining subscriber fees and advertising revenue, Entertainment

4  Studios would generate approximately $1.8 billion in annual revenue from its

5  carriage and advertising contracts with Comcast / Time Warner Cable.  Moreover,

6  with distribution on two of the largest television platforms in the nation, the demand

7  for Entertainment Studios' channels both domestically and internationally would

8  increase, leading to additional growth and revenue for Entertainment Studios'

9  channels.

10    104.   Based on the revenue Entertainment Studios would generate if

11  Defendants contracted with them in good faith, Entertainment Studios would be

12  valued at approximately $20 billion.

13    105.   Similarly situated lifestyle and entertainment media companies are

14  valued at higher amounts.  But for Comcast's and Time Warner Cable's refusal to

15  contract with Entertainment Studios, Entertainment Studios would have a similar

16  valuation.

17    106.   Accordingly, Comcast's and Time Warner Cable's unlawful

18  discrimination has caused Entertainment Studios in excess of $20 billion in

19  damages, according to proof at trial; plus punitive damages for intentional,

20  oppressive and malicious racial discrimination.

21  ## PRAYER FOR RELIEF

22  **WHEREFORE**, Plaintiffs pray for judgment, as follows:

23  1.   Plaintiff Entertainment Studios prays for compensatory, general and

24      special damages in excess of $20 billion according to proof at trial;

25  2.   Plaintiffs NAAAOM and Entertainment Studios pray for injunctive

26      relief prohibiting Comcast and Time Warner Cable from discriminating

27      against African American–owned media companies, including

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Entertainment Studios, based on race in connection with contracting for carriage and advertising;

3.   Plaintiff Entertainment Studios prays for punitive damages, based on oppression and malice, according to Defendants' net worth;

4.   Plaintiff Entertainment Studios prays for attorneys' fees, costs and interest; and

5.   Plaintiffs NAAAOM and Entertainment Studios pray for such other and further relief as the court deems just and proper.

DATED:  September 21, 2015          Respectfully Submitted,

MILLER BARONDESS, LLP

By: _____*/s/ Louis R. Miller*_____
          LOUIS R. MILLER
          Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400   FAX:(310) 552-8400

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiffs hereby demand trial by jury pursuant to the Seventh Amendment of

3  the United States Constitution.

4

5  DATED:  September 21, 2015      MILLER BARONDESS, LLP

6

7

8                         By:      */s/ Louis R. Miller*

9                              LOUIS R. MILLER

10                           Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400