1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  AMNON Z. SIEGEL (State Bar No. 234981)
   asiegel@millerbarondess.com
3  LAUREN R. WRIGHT (State Bar No. 280809)
   lwright@millerbarondess.com
4  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
5  Los Angeles, California 90067
   Telephone:  (310) 552-4400
6  Facsimile:   (310) 552-8400

7  Attorneys for Plaintiffs

8              UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11 | NATIONAL ASSOCIATION OF          | CASE NO. 2:15-cv-01239-TJH-MAN
12 | AFRICAN AMERICAN-OWNED
   | MEDIA, a California limited liability
13 | company; and ENTERTAINMENT       | PLAINTIFFS' OPPOSITION TO
   | STUDIOS NETWORKS, INC., a         | MOTION TO DISMISS
   | California corporation,            | PLAINTIFFS' FIRST AMENDED
14 |                                   | COMPLAINT BY DEFENDANT
   |                                   | COMCAST CORPORATION
15 |         Plaintiffs,
   |                                   | [Request for Judicial Notice filed
16 |    v.                             | concurrently herewith]

17 | COMCAST CORPORATION, a
   | Pennsylvania corporation; TIME
18 | WARNER CABLE INC., a Delaware     | Judge:    Hon. Terry J. Hatter, Jr.
   | corporation; and DOES 1 through 10,| Date:     December 28, 2015
19 | inclusive,                         | Time:     UNDER SUBMISSION
   |                                   | Ctrm.:    17
20 |         Defendants.

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ..................................................................................1

II.  FACTUAL ALLEGATIONS.................................................................4

    A.  ESN ..............................................................................................4

    B.  Comcast's Discriminatory Refusal to Contract with ESN ...................5

    C.  Comcast's History of Racial Discrimination in Contracting.................6

    D.  Comcast Executes a Sham Memorandum of Understanding and Thereby Defrauds the FCC ..........................................................7

    E.  Comcast Uses the MOU to Racially Discriminate Against ESN ..........8

III.  LEGAL STANDARD ..........................................................................9

IV.  ARGUMENT .......................................................................................9

    A.  Plaintiffs' § 1981 Claim Is Supported by the FAC's Additional Allegations Regarding Comcast's Discriminatory Intent ...................10

        1.  Comcast's History of Racial Discrimination in Contracting for Carriage Supports an Inference of Discrimination Here.......10

        2.  Comcast's Violations of the MOU Also Evidence Its Discriminatory Intent in Refusing to Contract with ESN .........13

        3.  Comcast's Treatment of ESN Shows that Its Purported "Business Reasons" for Denying Carriage Are Pretextual.........16

    B.  Comcast's Remaining Arguments for Dismissal Fail ..........................18

        1.  Plaintiffs Need Not Identify Similarly Situated Channels .........18

        2.  Plaintiffs Need Not Exclude All Possible Alternative Explanations for Comcast's Conduct .......................................21

        3.  The First Amendment Does Not Immunize Comcast's Racial Discrimination in Contracting for Carriage ...................22

V.  CONCLUSION ..................................................................................25

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................. 9

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)..........................................................9, 19

*Butler v. Home Depot, Inc.,*
984 F. Supp. 1257 (N.D. Cal. 1997)..............................................13

*Claybrooks v. Am. Broad. Cos., Inc.,*
898 F. Supp. 2d 986 (M.D. Tenn. 2012)..........................................24

*Clemons v. Keller Williams Realty, Inc.,*
2012 WL 994623 (C.D. Cal. Mar. 23, 2012)......................................20

*Del Monte Int'l GmbH v. Del Monte Corp.,*
995 F. Supp. 2d 1107 (C.D. Cal. 2014) .......................................... 9

*Gonzales v. Police Dep't, City of San Jose, Cal.,*
901 F.2d 758 (9th Cir. 1990)....................................................13

*Haley v. TalentWise, Inc.,*
2014 WL 1648480 (W.D. Wash. Apr. 23, 2014)..................................18

*Heyne v. Caruso,*
69 F.3d 1475 (9th Cir. 1995)...............................................12, 13

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
515 U.S. 557 (1995).........................................................23, 24

*In re Century Aluminum Co. Securities Litigation,*
729 F.3d 1104 (9th Cir. 2013)...................................................21

*Lanier v. Clovis Unified Sch. Dist.,*
2010 WL 3733953 (E.D. Cal. Sept. 20, 2010)....................................20

*Lindsey v. SLT L.A., LLC,*
447 F.3d 1138 (9th Cir. 2005)...............................................18, 20

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973)......................................................18, 19, 20

*McGinest v. GTE Serv. Corp.,*
360 F.3d 1103 (9th Cir. 2004)...................................................19

*O'Donnell v. U.S. Bancorp Equip. Fin., Inc.,*
2010 WL 2198203 (N.D. Cal. May 28, 2010)....................................19

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

*Pac. Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013)...............................................................19

*Sheppard v. David Evan & Assocs.*,
    694 F.3d 1045 (9th Cir. 2012)...............................................................19

*Spulak v. K Mart Corp.*,
    894 F.2d 1150 (10th Cir. 1990)..............................................................12

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011)...............................................................22

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002).............................................................9, 19, 20

*Turner Broad. Sys., Inc. v. FCC (Turner I)*,
    512 U.S. 622 (1994)..................................................5, 22, 23, 24

*Turner Broadcasting System, Inc. v. FCC*,
    520 U.S. 180 (1997)..............................................................23

*United States v. O'Brien*,
    391 U.S. 367 (1968)..............................................................23

*Zimmerman v. City of Oakland*,
    255 F.3d 734 (9th Cir. 2001)...................................................... 9

## **STATUTES**

42 U.S.C. § 1981.......................................................................passim

Fed. R. Civ. P. Rule 12(b)(6) ...........................................................12, 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

# I.    __INTRODUCTION__

In its Motion to Dismiss, Defendant Comcast Corporation ("Comcast") claims that its reason for denying carriage to Plaintiff Entertainment Studios Networks, Inc. ("ESN") was based on non-discriminatory, business reasons.  But ESN has made substantial allegations that Comcast's excuses were phony and pretextual.  Comcast gave ESN the runaround in their negotiations for channel carriage, just as it did with other African American–owned channel operators.  When ESN satisfied an obstacle created by Comcast, Comcast denied carriage and came up with a new pretextual excuse.  (*See* First Amended Complaint ["FAC"] ¶¶ 58-65.)

Comcast told ESN that in order to obtain carriage, it would have to go through a separate path to obtain carriage:  The "MOU Process," which is reserved for networks with "majority or substantial" African American ownership.  Comcast claims that the MOU Process provided an "*additional* avenue to obtain carriage," but that is not the case. (Mot. to Dismiss at 12.)  Comcast used the MOU Process as a way to further discriminate against and deny carriage to ESN's channels as well as other networks with majority or substantial African American ownership.

Comcast deliberately violated its own affirmative action policy.  It rejected ESN and other networks with majority or substantial African American ownership in favor of non-African American-owned networks that use African American celebrities with nominal ownership stakes posing as figureheads for the channels.  And Comcast further refused to consider carriage for ESN under the non-MOU Process utilized by non-African American-owned channels.

Comcast's "argument" about the purpose and use of the MOU Process is contradicted by Plaintiffs' allegations.  If the MOU Process was in fact a way to enhance diversity, why did Comcast choose networks that are majority or substantially owned by non-African Americans?  As this preliminary stage, it is not for the Court to decide who is right.  Comcast's purported justifications for refusing

Miller Barondess, llp
Attorneys at Law
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400    Fax: (310) 552-8400

1  to deal with ESN are pretextual.  ESN and other networks with majority or

2  substantial African American ownership were kicked to the curb and told to wait in

3  line in the rigged MOU Process.

4      Comcast has admitted to ESN that its networks and programming are "good

5  enough" for Comcast's platform.  But because ESN is owned and operated by Byron

6  Allen, an African American, Comcast told ESN that its only opportunity for carriage

7  would be via Comcast's discriminatory MOU Process.

8      After filing this lawsuit, ESN learned that it was not alone—Comcast's racial

9  discrimination has affected other African American–owned media companies.  The

10  FAC alleges facts regarding Comcast's discriminatory refusal to do business with

11  these African American–owned media companies, supporting discriminatory intent

12  in Comcast's refusal to contract with ESN.  Comcast's discriminatory treatment of

13  the Historically Black Colleges and University Network mirrors the manner in

14  which Comcast treated ESN:  Both networks were strung along during carriage

15  negotiations, Comcast admitted that both channels were good enough for its

16  television platform, yet both channels were relegated to the MOU Process and

17  ultimately denied carriage in favor of channels that are not majority or substantially

18  African American-owned.

19      Comcast also circumvented and violated the memorandum of understanding

20  ("MOU") it entered into to secure its merger with NBC Universal.  Comcast

21  specifically committed to add four networks "in which African Americans have a

22  majority or substantial ownership."  But Comcast has not launched *any* networks

23  with "majority or substantial" African American ownership.

24      Comcast's failures in this regard have not gone unnoticed.  In August 2014,

25  fifty-one members of the Congressional Black Caucus submitted a letter to the FCC

26  requesting that in evaluating several then-pending merger applications, the FCC take

27  steps to protect media diversity.  (*See* Request for Judicial Notice ["RJN"] Ex. C.)

28  In that letter, the Congressional Black Caucus lamented the fact that "even the most

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  reasonable conditions and diversity pledges" contained in prior mergers have gone

2  "unenforced." (*Id.* at 2.)

3  Thankfully, slavery and lynching no longer occur in this country, but there is

4  still racial discrimination.  Racial discrimination permeates our economy and is

5  prevalent in the media business.  Indeed, concern regarding the effect of media

6  consolidation on the viability of minority-owned media companies is what prompted

7  the Congressional Black Caucus to write to the FCC.  (*See id.* [remarking on this

8  country's "media landscape in which diverse ownership is near extinction"].)  The

9  Congressional Black Caucus warned that charitable donations by major media

10  companies, such as Comcast, "should not supplant substantive plans to contract with

11  minority and women-owned firms." (*Id.*)  But Comcast has done just that:  It has

12  made monetary contributions to non-media civil rights groups in lieu of contracting

13  with African American–owned media companies.

14  Comcast also claims that Plaintiffs' allegations are defective because they fail

15  to exclude the possibility that an alternative explanation (Comcast's purported

16  business reasons) is true.  This is not the law.  If it were, it would create an

17  impossible burden on plaintiffs pleading racial discrimination.  At the motion to

18  dismiss stage, Plaintiffs are not required to refute Comcast's excuses for refusing to

19  contract with ESN.  It is not until the summary judgment burden-shifting inquiry

20  when Comcast will be required to satisfy its burden of proving a non-discriminatory

21  basis for its decision.  If Comcast satisfies its burden, the burden will shift back to

22  Plaintiffs to raise a triable issue of fact that Comcast's purported non-discriminatory

23  reasons are pretextual.

24  Comcast's arguments are premature.  If every defendant being sued for racial

25  discrimination could win a motion to dismiss by claiming that its decisions were

26  based on sound business reasons, virtually no racial discrimination claim could ever

27  survive a pleadings challenge without smoking-gun evidence of discriminatory

28  animus.  Comcast has created an artificially high—and incorrect—pleading standard

1    for racial discrimination claims.  The Court should reject Comcast's attempt, which

2    if adopted, would prevent numerous well-pleaded cases from proceeding past the

3    pleadings stage.

4         Comcast also presents a flawed First Amendment challenge to Plaintiffs'

5    § 1981 claim that is contrary to Supreme Court precedent.  Comcast is a cable

6    distributor—a conduit—and its First Amendment rights do not give it license to

7    discriminate on the basis of the racial composition of channel owners.  Application

8    of § 1981 to Comcast's carriage decisions does not run afoul of the First

9    Amendment.

10   **II.    FACTUAL ALLEGATIONS**

11        **A.    ESN**

12        ESN is a 100% African American–owned video programming producer and

13   multi-channel operator/owner, which owns and operates seven original content, high

14   definition television networks.  (FAC ¶¶ 14-17.)  It was founded in 1993 by Byron

15   Allen, an African American actor and media entrepreneur.  (FAC ¶ 15.)

16        ESN has carriage agreements with more than 40 distributors nationwide,

17   including major distributors such as Verizon, CenturyLink and RCN.  (FAC ¶ 16.)

18   These television distributors make ESN's channels available to a combined 7.5

19   million subscribers.  (FAC ¶ 16.)  ESN's shows have proved popular among viewers

20   of all demographics and have even garnered Emmy award nominations and wins.

21   (*See* FAC ¶ 17 & Ex. A.)

22        Most recently, in December 2012, ESN launched "Justice Central," a 24-hour,

23   high-definition legal and news network featuring several Emmy-nominated and

24   Emmy-award winning legal/court shows.  (FAC ¶ 18.)  After just two years, "Justice

25   Central" has already proved itself a successful, high-demand network, boasting

26   triple-digit ratings growth across key television periods.  (FAC ¶¶ 18, 64.)

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**B.    Comcast's Discriminatory Refusal To Contract With ESN**

Owners and producers of television content generally do not have a means of direct access to television viewers.  Content owners and producers, like ESN, rely on television distributors, like Comcast, to reach television consumers.  (Compl. ¶ 103.)  Television distributors thus "function[], in essence, as a conduit for the speech of others, transmitting it on a continuous and unedited basis to subscribers." *Turner Broad. Sys., Inc. v. FCC (Turner I)*, 512 U.S. 622, 629 (1994).

Comcast is therefore in a unique position to block content produced by 100% African American–owned media companies, such as ESN, from reaching their millions of subscribers.  *See id.* at 656 (noting that television distributors have "bottleneck, or gatekeeper, control over most (if not all) of the television programming that is channeled into the subscriber's home").

In fact, Comcast has successfully shut ESN out from its 22 million subscribers—more than any other cable television distributor in the United States. (FAC ¶ 19.)  ESN has been attempting to contract with Comcast for a carriage agreement for several years.  (FAC ¶ 57.)  In that time, Comcast has strung ESN along, leading it to believe that its channels were on Comcast's "short list" when, in fact, Comcast had no intention of contracting with this 100% African American– owned media company.  (FAC ¶ 57.)

In dealing with ESN, Comcast set up a series of insurmountable hurdles for ESN to overcome.  (FAC ¶¶ 57-60.)  For example, Comcast Corporate told ESN that ESN had to garner support from Comcast's division offices before Comcast would consider a carriage deal.  But when ESN reached out to the various Comcast divisions, they told ESN that they "deferred to Corporate" and refused to provide support.  (FAC ¶ 59.)  Comcast Corporate also advised ESN that it needed positive feedback from key Comcast regions.  But when ESN obtained Comcast regional support (*e.g.*, Chicago, Southwest), Comcast Corporate still denied carriage.  (FAC ¶ 60.)  In some cases, Comcast advised ESN (inconsistently) *not* to meet with the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

regions because all carriage decisions were funneled through corporate.  (FAC ¶ 60.)

Although these obstacles were purportedly in place for ESN to "prove" its channels' worth, it soon became clear that Comcast had no intention of contracting with ESN:  Every time ESN met or exceeded Comcast's demands, Comcast came up with yet another excuse—or pretext—for refusing carriage.  (FAC ¶¶ 57-62.)  Comcast required ESN to run around in circles and spend hundreds of thousands of dollars in the process.  (FAC ¶ 60.)

### C.    Comcast's History Of Racial Discrimination In Contracting

In its more than fifty years distributing cable television, Comcast has not distributed a single independent 100% African American–owned network.  (FAC ¶ 81.)  Comcast has gone to great lengths to avoid doing business with African American–owned media companies, as demonstrated by Plaintiffs' allegations regarding several other media companies that Comcast has rebuffed on the basis of race.  (*See* FAC ¶¶ 81-94.)

Comcast discriminated against the 100% African American–owned Black Family Channel.  Black Family Channel was founded by renowned African American attorney Willie E. Gary and other prominent African American entrepreneurs, including baseball legend Cecil Fielder, former heavyweight boxing champion Evander Holyfield, Marlon Jackson of the Jackson Five, and television executive Alvin James.  (FAC ¶ 83.)  Comcast treated Black Family Channel unequally as compared to its non-minority-owned counterparts by demanding an ownership interest in the company in order to secure continued carriage on Comcast's system.  (FAC ¶¶ 84-86.)  When Black Family Channel refused, Comcast used its power over the distribution platform to limit Black Family Channel's expansion to new markets and penetration of existing markets, eventually leading to the network's demise.  (FAC ¶¶ 84-87.)

Comcast also discriminated against 100% African American–owned HBCU Network.  Comcast and HBCU Network had reached advanced stages of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

negotiations for carriage when Comcast suddenly and unexpectedly forced HBCU Network to start over at square one.  (FAC ¶¶ 90-92.)  Comcast told HBCU Network that in light of the merger between Comcast and NBCU, Comcast was required to launch a certain number of minority-owned networks.  (FAC ¶ 91.)  Just as it told ESN, Comcast told HBCU Network that it could seek carriage only via the MOU Process.  (FAC ¶ 91.)  In other words, because HBCU Network was African American owned, it was prevented from obtaining carriage through Comcast's normal contracting process.  (FAC ¶¶ 91-92.)

### D. Comcast Executes A Sham Memorandum Of Understanding And Thereby Defrauds The FCC

In 2010, Comcast sought FCC approval to acquire NBCU.  (FAC ¶¶ 4, 30.) Opponents of the merger voiced concerns about the lack of diversity in Comcast's channel offering.  (FAC ¶¶ 30-31.)  Comcast was widely criticized for its failure to distribute minority owned-and-operated channels, including channels owned by 100% African American–owned media companies, such as ESN.  (FAC ¶ 30.)

Comcast's failure to distribute minority-produced programming jeopardized approval of the Comcast/NBCU deal.  (FAC ¶ 32.)  In need of support, Comcast shelled out millions in "donations" to non-media civil rights groups in exchange for their public support of the acquisition.  (FAC ¶¶ 32-33, 35-39.)  In exchange for these lucrative payouts, the non-media civil rights groups agreed to enter into the MOU, whereby Comcast agreed to add four new independently owned and operated networks "in which African Americans have a majority or substantial ownership interest" over the next eight years.  (RJN Ex. A at 9.)

Although the MOU on its face purports to advance programming opportunities for "majority or substantial" African American–owned media companies, Comcast has not implemented it to accomplish that purpose.  Instead, Comcast has used the MOU to facilitate racial discrimination in contracting.  (See FAC ¶ 44.)  Comcast's monetary handouts to the non-media civil rights groups have

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  served to paper over Comcast's refusal to do business with truly minority-owned

2  businesses.

3       The MOU requires that Comcast launch networks "in which African

4  Americans have a *majority or substantial* ownership interest."  (RJN Ex. A at 9

5  [emphasis added].)  But the networks Comcast has launched pursuant to the MOU

6  are owned, controlled, and backed by white-owned media and money.  (FAC ¶¶ 50-

7  53.)  For example, one of the two "Black channels" Comcast launched pursuant to

8  the MOU—*REVOLT*—is actually owned by Highbridge Capital, a subsidiary of JP

9  Morgan.  (FAC ¶ 51.)  The other "Black channel"—*Aspire*—is actually owned by

10  Intermedia Partners, which is owned/controlled by a white businessman, Leo

11  Hindery.  (FAC ¶ 51.)

12       Comcast has flagrantly refused to honor the "diversity initiatives" set forth in

13  the MOU.  Comcast has given African American celebrities token ownership

14  interests in these channels to make it look like it has complied with its MOU

15  commitments.  (FAC ¶ 52.)  Comcast's use of African American figureheads, rather

16  than actually contracting with media companies with "majority or substantial"

17  African American ownership, evidences Comcast's discriminatory intent.

18     **E.**    **Comcast Uses The MOU To Racially Discriminate Against ESN**

19       Comcast has used the MOU to discriminate against majority or substantial

20  African American–owned media in general, and ESN in particular, in contracting

21  for channel carriage.

22       Pursuant to the MOU, Comcast has created two separate paths for contracting

23  for channel carriage:  one for non-minority-owned channels and a separate, but not

24  equal, process for 100% African American–owned channels (*i.e.*, the "MOU

25  Process").  (FAC ¶¶ 45-49, 66-71.)  Under the MOU Process, Comcast has limited

26  the number of carriage agreements it will enter into with networks with "majority or

27  substantial" African American ownership to just *four* between 2011 (when the

28  Comcast/NBCU deal closed) and 2019.  (*See* RJN Ex. A at 9; FAC ¶ 46.)  Under

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Comcast's normal contracting practices with non-minority-owned channels, there is no similar cap on the number of contracting opportunities that are available.  (FAC ¶ 46.)

In November 2014, a Comcast executive told ESN that, although ESN's channels were good enough for carriage on Comcast's television platform, ESN would have to wait to be part of the "next round of [MOU] considerations."  (FAC ¶ 68.)  Because ESN is a 100% African American–owned media company, Comcast relegated ESN to the manipulated MOU Process, where it would be forced to compete for just two remaining slots for channel carriage.

## III.   <u>LEGAL STANDARD</u>

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept Plaintiffs' factual allegations as true and view all inferences in the light most favorable to Plaintiffs.  *See Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001).  To defeat a motion to dismiss for failure to state a claim, the complaint's factual allegations merely must state a "plausible" claim for relief.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "[D]etailed factual allegations" are not required.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

"The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of its claim."  *Del Monte Int'l GmbH v. Del Monte Corp.*, 995 F. Supp. 2d 1107, 1113 (C.D. Cal. 2014) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).  Indeed, "a well-pleaded complaint may proceed even it if strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

## IV.   <u>ARGUMENT</u>

The FAC states a plausible claim for racial discrimination in contracting in violation of § 1981.  After coming up with inconsistent and pretextual excuses to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

rebuff ESN's attempts to contract for carriage, Comcast forced ESN to proceed via the MOU Process.  In the MOU Process, African American–owned media companies are afforded far fewer carriage opportunities—Comcast committed to launching just *four* networks with "majority or substantial" African American ownership, whereas there is no similar cap on the number of networks Comcast will enter into via its normal contracting process.  (*See* FAC ¶ 49.)

ESN is a victim of Comcast's discrimination.  Comcast has admitted that ESN's content is "good enough" for its distribution system, but nevertheless told ESN that its only option to obtain carriage was to wait for the "next round of [MOU] considerations."  (FAC ¶ 68.)  Comcast relegated ESN (and the HBCU Network) to the MOU Process because ESN's owner, Byron Allen, is African American.

### A.    Plaintiffs' § 1981 Claim Is Supported By The FAC's Additional Allegations Regarding Comcast's Discriminatory Intent

In its Motion, Comcast takes issue with the fact that Plaintiffs have "recycled wholesale" their "theor[y]" that Comcast utilizes the MOU to perpetuate racial discrimination in contracting, claiming that the Court "already rejected" this theory.  (Mot. to Dismiss at 5; *see also id.* at 8, 13.)  Not so.

The Court granted Comcast's prior motion to dismiss *with leave to amend* not because it "rejected" Plaintiffs' theory of discrimination, but because it found that Plaintiffs had not alleged sufficient facts in support of that theory.  (*See* Order at 3, Aug. 5, 2015, ECF No. 42.)  The FAC adds substantial allegations to support a plausible § 1981 claim.

### 1.    Comcast's History of Racial Discrimination in Contracting for Carriage Supports an Inference of Discrimination Here

In support of their § 1981 claim, Plaintiffs allege facts regarding Comcast's discrimination against a series of other African American–owned media companies:

***Black Family Channel.***  The FAC alleges that Comcast discriminated against the Black Family Channel, a 100% African American–owned network, by

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

10

1   demanding an ownership interest in the network to secure continued carriage—a

2   demand that Comcast does not place on non-minority-owned networks.  (FAC

3   ¶¶ 84-86.)  Comcast disputes these allegations (*see* Mot. to Dismiss at 6), but

4   Comcast's factual disagreement is irrelevant on a motion to dismiss.  And

5   Comcast's suggestion that these allegations should be disregarded as "conclusory" is

6   likewise unfounded.[1]  (*Id.*)  As alleged in the FAC, Comcast did not impose its

7   ownership-for-carriage requirement on the non-minority-owned channels it

8   distributes on its television platform.  (FAC ¶ 86.)

9       ***Soul Train.***  As further evidence of Comcast's racial discrimination, the FAC

10  alleges that Comcast refused to do business with Don Cornelius Productions, a

11  100% African American–owned media company that had plans to launch a Soul

12  Train network.  (FAC ¶ 94.)  Although Comcast attacks the sufficiency of these

13  allegations (*see* Mot. to Dismiss at 8), accepting them as true, these allegations

14  further bolster Plaintiffs' claim that Comcast has a pattern and practice of refusing

15  to do business with African American–owned media companies.

16      ***HBCU Network.***  The FAC also alleges that Comcast discriminated against

17  the HBCU Network by requiring this 100% African American–owned network to

18  seek carriage via Comcast's discriminatory MOU Process, rather than through

19  Comcast's normal procedures for contracting for carriage.  (FAC ¶¶ 90-93.)

_____

21  [1] Hoping to escape the FAC's well-pleaded allegations, Comcast claims that the
    allegations should be disregarded as "conclusory."  (*See* Mot. to Dismiss at 2, 5, 6,
22  8, 9, 10-11, 13, 14, 15 [describing essentially all of the FAC's factual allegations as
    "conclusory"].)  But Plaintiffs' factual allegations regarding the manner in which
23  Comcast treated other 100% African American–owned media companies, for
    example, are far from conclusory.  The FAC alleges the who (Black Family
24  Channel, HBCU Network, Soul Train); the what (Comcast's discriminatory and
    unequal demands on African American–owned networks, including its demand that
25  such networks obtain carriage only via the MOU Process); and the when (2002,
26  2011).  (*See* FAC ¶¶ 81-94.)  These specific allegations support a plausible theory of
    racial discrimination.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

11

Although Comcast expressed that it was "excited" about HBCU Network and even offered a carriage deal, Comcast later reneged on that offer. (FAC ¶¶ 90-93.) Comcast stated that in light of the diversity commitments it made in connection with the NBCU merger, HBCU Network's only opportunity for carriage would be through the MOU Process. (FAC ¶ 91.)

Comcast again resorts to disputing these factual allegations, which is improper in its Rule 12(b)(6) motion. (*See* Mot. to Dismiss at 7.) Contrary to Comcast's self-serving characterization, the MOU Process did not provide a "*leg up* for minority-owned networks." (*Id.*; *see also id.* at 9, 11-13.) Rather, Comcast relegated minority-owned networks—such as HBCU Network and ESN—to the MOU Process, pursuant to which Comcast offered far fewer contracting opportunities. (FAC ¶¶ 46-49, 90-93.) Comcast changed the rules mid-game.

Comcast's treatment of the Black Family Channel, Soul Train and HBCU Network supports Plaintiffs' § 1981 claim. Indeed, Comcast's treatment of other African American-owned entities is probative of Comcast's motive in refusing to deal with ESN. *See, e.g.*, *Heyne v. Caruso*, 69 F.3d 1475, 1479 (9th Cir. 1995) (noting that "conduct tending to demonstrate hostility towards a certain group is both relevant and admissible" to show that the defendant's "general hostility towards that group is the true reason" behind the discriminatory action); *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990) ("As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent.").

Comcast has a pattern and practice of making discriminatory demands on African American–owned media companies. Comcast's conduct toward HBCU Network, in particular, mirrors the manner in which Comcast discriminated against ESN: Comcast told both 100% African American–owned media companies that their channels were "good enough" for Comcast's distribution platform, but nevertheless strung them along with excuses and eventually relegated both

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    companies to the MOU Process.  (FAC ¶¶ 68, 90-92.)  Comcast's refusal to do

2    business with African American–owned media companies supports the plausible

3    inference that Comcast's refusal to deal with ESN was motivated by racial animus

4    and not legitimate business considerations.  *Cf. Heyne*, 69 F. 3d at 1479-80 (holding

5    that evidence of sexual harassment of other female workers is probative of motive).[2]

6        **2.    Comcast's Violations of the MOU Also Evidence Its**

7        **Discriminatory Intent in Refusing to Contract with ESN**

8        The FAC also includes more detailed factual allegations regarding Comcast's

9    violations of the "diversity commitments" it made in the MOU.  Again, these

10   allegations bolster Plaintiffs' § 1981 claim:  Comcast's knowing and deliberate

11   violation of these commitments is further evidence of racial animus.  *Butler v. Home*

12   *Depot, Inc.*, 984 F. Supp. 1257, 1261-62 (N.D. Cal. 1997); *see also Gonzales v.*

13   *Police Dep't, City of San Jose, Cal.*, 901 F.2d 758, 761 (9th Cir. 1990) ("[E]vidence

14   that the employer violated its own affirmative action plan may be relevant to the

15   question of discriminatory intent.").  Comcast's failure to live up to its purported

16   diversity commitments not only demonstrates that the MOU is a sham, it also

17   evidences Comcast's discriminatory intent in refusing to deal with ESN.

18       ***Comcast Did Not Launch Any Networks With "Majority or Substantial"***

19   ***African American Ownership.***  Through the MOU, Comcast purportedly committed

20   to launching four networks "in which African Americans have a majority or

21   substantial ownership interest."  (RJN Ex. A at 9.)  But, in fact, the MOU has not

_____

23   [2] In its Motion, Comcast claims that Plaintiffs "expressly *admit* that Comcast *does*

24   contract with African American content providers."  (Mot. to Dismiss at 2.)  But the

     only 100% African American–owned channel on Comcast's television platform is

25   *The Africa Channel*, which is owned and operated by a former Comcast insider who

26   co-authored the MOU.  (FAC ¶¶ 53-54.)  In other words, Comcast refuses to do

     business with African American–owned media companies unless it has a stake in the

27   game.  That Comcast carries *The Africa Channel* does not disprove Plaintiffs'

28   § 1981 claim.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

resulted in the launch of *any* networks with "majority or substantial" African American ownership.  (FAC ¶¶ 4, 42, 44, 50-55.)  Instead, Comcast launched channels that are owned and controlled by white-owned media and money.

For example, one of the supposedly "Black channels" Comcast launched—*REVOLT*—is actually owned by Highbridge Capital (a JP Morgan subsidiary). (FAC ¶ 51.)  And the other supposed "Black channel"—*Aspire*—is owned by Intermedia Partners (owned by white businessman Leo Hindery).  (FAC ¶ 51.)  Both networks give African American celebrities token ownership interests, but this hardly satisfies the MOU's requirement that the channels have "majority or substantial" African American ownership.  (FAC ¶ 52; RJN Ex. A at 9.)  Comcast is flouting the MOU by contracting with channels without "majority or substantial" African American ownership.[3]

Comcast argues that because the MOU states "[o]n its face" that it was "designed to *benefit* African American programmers," it cannot serve as the basis for Plaintiffs' § 1981 claim.  (Mot. to Dismiss at 12.)  Comcast is mistaken.[4]

---

[3] Attempting to obfuscate the issue, Comcast mischaracterizes Plaintiffs' allegations.  The FAC alleges that Comcast violated the MOU by failing to contract with networks "with truly '**majority or substantial**' African American ownership," as the MOU requires.  (FAC ¶ 52.)  Comcast claims that Plaintiffs' allegations are based on discrimination against only 100% African American-owned media companies.  (Mot. to Dismiss at 14.)  As set forth in the FAC, this is false.  Plaintiffs are claiming discrimination against majority or substantial African American-owned channels.

[4] As support, Comcast cites a single case, which reaches the unremarkable conclusion that a court need not accept as true allegations that contradict documents that are incorporated by reference into the complaint or are subject to judicial notice. (Mot. to Dismiss at 13 [citing *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014)].)  Comcast's reliance on the incorporation-by-reference doctrine is misplaced.  The FAC does not allege that the MOU says something that it does not really say; it alleges that the MOU purports to make certain "diversity commitments" that Comcast never intended to—and in fact did not—fulfill.  (FAC ¶¶ 3-4, 30-41, 50-55.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Plaintiffs do not contest that the MOU *purports* to benefit media companies with "majority or substantial" African American ownership. But the heart of Plaintiffs' § 1981 claim is that Comcast is using the MOU contrary to its purported purpose. The MOU was a ploy to garner support for Comcast's then-pending merger with NBCU: Comcast wanted to make it *look* like it intended to do business with African American–owned media companies. (FAC ¶¶ 3-4, 30-39.) But Comcast had no intention of doing so.

According to Comcast, the MOU provides African American–owned networks with "an additional avenue to obtain carriage" and Comcast does not "exclude those applicants from the 'normal' contracting process." (Mot. to Dismiss at 12.) This is directly contradicted by the FAC's allegations. Comcast relegated *two* African American–owned media companies seemingly on the verge of carriage agreements (ESN and HBCU Network) to the MOU Process—not as an *additional* contracting opportunity, but as the *only* avenue for obtaining carriage. (FAC ¶¶ 66-69, 90-92.) Comcast's self-serving characterization of the MOU Process must be rejected in favor of these well-pleaded factual allegations.

### The Diversity Advisory Council Established By The MOU Does Nothing.

The MOU also required Comcast to establish a "Diversity Advisory Council" to advise Comcast as to its diversity initiatives in contracting for carriage, among other areas. (FAC ¶¶ 34, 41; RJN Ex. A at 3.) But this commitment was a sham, too. Not only do the Council members have limited understanding of the cable industry and little-to-no experience operating cable networks, but Comcast has not given the Council any real authority to influence Comcast's contracting practices. (FAC ¶ 41.) Instead, Comcast gave the Council a standard tour of its offices and never even asked its members about channel carriage. (FAC ¶ 41.) The "Diversity Advisory Councils" are more window dressing.

Comcast refutes the FAC's allegations regarding the bogus Diversity Advisory Councils, citing its self-prepared FCC compliance reports. (*See* Mot. to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Dismiss at 15.)  Comcast suggests that because the 2013 FCC compliance report vaguely states that the Diversity Advisory Council "plays a significant role" in advising Comcast on its "diversity and inclusion efforts," the Court should ignore Plaintiffs' well-pleaded allegations to the contrary.  (*Id.*; Decl. of Douglas Fuchs in Support of Mot. to Dismiss ["Fuchs Decl."] Ex. 1 at 23.)  Not so.

Plaintiffs specifically allege that Comcast's FCC compliance reports contain misstatements regarding Comcast's compliance with the MOU.  (FAC ¶ 40.)  Moreover, nothing in the 2013 FCC compliance report actually contradicts the FAC's allegations.  The report states only that the Council held formal meetings with Comcast leadership; it does not provide details as to the contents of those meetings, which Plaintiffs allege consisted of nothing more than perfunctory tours and presentations.  (*See* Fuchs Decl. Ex. 1 at 23-24; FAC ¶ 41.)  Nor does the report say anything about the Council's involvement in advising Comcast as to its diversity commitments in contracting for carriage.  (*See* Fuchs Decl. Ex. 1 at 23-24.)  In fact, the Council had no real authority to influence Comcast's carriage contracting policies.  (FAC ¶ 41.)  Again, Comcast's self-serving characterization does not overcome the FAC's well-pleaded factual allegations.

### 3.    Comcast's Treatment of ESN Shows that Its Purported "Business Reasons" for Denying Carriage Are Pretextual

The overarching theme of Comcast's Motion is that it simply made a legitimate business decision not to contract with ESN for carriage.  (*See* Mot. to Dismiss at 1-3, 9, 15-18.)  But the FAC's allegations regarding Comcast's treatment of ESN completely undermine this defense:  Far from making a legitimate business decision, Comcast never took ESN's carriage request seriously; instead, Comcast came up with phony excuses and gave ESN the runaround in their negotiations for carriage.

The FAC alleges that as part of their carriage "negotiations," Comcast required ESN to surmount a series of pretextual hurdles.  For example, as a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  condition for carriage, Comcast Corporate required ESN to obtain support from the

2  Comcast Divisions and Regions.  (FAC ¶¶ 59-60.)  ESN spent a significant amount

3  of time and resources garnering such support, only to discover that this requirement

4  was meaningless.  (FAC ¶ 60.)  Not only did Comcast Corporate deny carriage even

5  after ESN received Comcast Division and Region support, but the Divisions and

6  Regions also made clear that they "deferred to Corporate" on all carriage decisions.

7  This was not a case of the left hand not knowing what the right was doing; rather,

8  Comcast was deliberately giving ESN the runaround.  (FAC ¶¶ 59-50.)  Indeed, in

9  some cases, ESN was advised by Comcast (contrary to other statements by Comcast

10  Corporate) *not* to meet with the Regions because all carriage decisions were

11  funneled through Comcast Corporate.  (FAC ¶ 60.)

12       The FAC alleges facts regarding other phony excuses given by Comcast to

13  deny carriage, such as Comcast's statement to ESN that it was only interested in

14  adding carriage for news and sports channels.  (FAC ¶ 62.)  Again, this was simply

15  an excuse to avoid doing business with ESN.  In fact, Comcast added several other

16  non-news, non-sports channels at the same time as it refused to contract with both

17  ESN and HBCU Network (a channel focused on black college sports).  (FAC ¶ 62.)

18       Comcast forced ESN to incur many hundreds of thousands of dollars to

19  satisfy pretextual hurdles that ultimately had no bearing on its carriage decisions.

20  (FAC ¶ 60.)  And every time ESN met or exceeded Comcast's obstacles, Comcast

21  would move the goalposts and come up with another phony excuse to deny carriage.

22  The aforementioned conduct does not evidence that Comcast made a "legitimate

23  business decision" not to do business with ESN; rather, Comcast's excuses are the

24  very definition of pretext.

25       According to Comcast, the fact that it took meetings with ESN at all

26  somehow proves that Comcast's refusal to deal was not racially motivated.  (*See*

27  Mot. to Dismiss at 16-17.)  But the FAC alleges that these meetings consisted of

28  Comcast giving ESN phony excuses for declining carriage and setting up hurdles

that did not advance negotiations even after ESN met them.  (*See* FAC ¶¶ 56-69.)  In the face of Plaintiffs' well-pleaded allegations regarding Comcast's discriminatory treatment of ESN, the Court cannot resolve on the pleadings that Comcast's decision was based solely on legitimate business reasons.

Indeed, Comcast's legitimate business reasons defense is premature at this early stage of the proceedings.  After discovery, Comcast—not Plaintiffs—will bear the burden of "produc[ing] evidence of a legitimate non-discriminatory reason" for refusing to contract with ESN.  *Lindsey v. SLT L.A., LLC*, 447 F.3d 1138, 1147 (9th Cir. 2005) (discussing the second step in the *McDonnell Douglas* burden-shifting framework on summary judgment).  Comcast is attempting to place what will be its burden at *summary judgment* on Plaintiffs at the *motion to dismiss* stage.  This is improper.

Moreover, many of the purported "business reasons" cited by Comcast concern information that is solely within Comcast's possession.  (*See* Mot. to Dismiss 16-17 [listing business considerations such as Comcast's "priorities" for channel carriage, its "evaluation of the proposed programming," and the availability of bandwidth on Comcast's cable system].)  The Court cannot adjudicate the veracity of Comcast's purported "business reasons" without making factual determinations that are inappropriate on a motion to dismiss.  *See Haley v. TalentWise, Inc.*, 2014 WL 1648480, at *2 (W.D. Wash. Apr. 23, 2014) (denying motion to dismiss where plaintiff "could not plead more factual specificity because she [would] not have further evidence regarding [defendant's] procedures until the parties [began] discovery").

**B.**     **Comcast's Remaining Arguments for Dismissal Fail**

**1.**     **Plaintiffs Need Not Identify Similarly Situated Channels**

Comcast argues that the FAC fails to plausibly allege a § 1981 claim because Plaintiffs have not specifically identified "similarly situated non-diverse channels or their supposedly preferential treatment."  (Mot. to Dismiss at 11.)  This is not

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1 required.  Comcast is attempting to impose a pleading requirement that is contrary to

2 Supreme Court and Ninth Circuit authority.

3     The "similarly situated" element derives from the *McDonnell Douglas*

4 burden-shifting framework, which is used to evaluate claims of intentional

5 discrimination at the summary judgment stage and at trial—not on a motion to

6 dismiss.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  As the

7 Supreme Court has held:  "The prima facie case under *McDonnell Douglas* . . . is an

8 evidentiary standard, not a pleading requirement."  *Swierkiewicz*, 534 U.S. at 510.

9 Plaintiffs are "*not required* to plead a prima facie case of discrimination in order to

10 survive a motion to dismiss."  *Sheppard v. David Evan & Assocs.*, 694 F.3d 1045,

11 1050 n.2 (9th Cir. 2012); *see also O'Donnell v. U.S. Bancorp Equip. Fin., Inc.*, 2010

12 WL 2198203, at *3 (N.D. Cal. May 28, 2010) ("[A] prima facie case need not be

13 pleaded in a complaint alleging discrimination." (citing *Twombly*, 550 U.S. at 569-

14 70)).

15     Even at the summary judgment stage, it is "clearly establish[ed] that plaintiffs

16 who allege disparate treatment under statutory anti-discrimination laws need not

17 demonstrate the existence of a similarly situated entity who or which was treated

18 better than the plaintiffs in order to prevail."  *Pac. Shores Props., LLC v. City of*

19 *Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013); *see also id.* at 1159

20 ("*McDonnell Douglas* simply *permits* a plaintiff to raise an inference of

21 discrimination by identifying a similarly situated entity who was treated more

22 favorably.  It is not a straightjacket *requiring* the plaintiff to demonstrate that such

23 similarly situated entities exist."); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103,

24 1122 (9th Cir. 2004).  It would be illogical if, to survive a motion to dismiss,

25 Plaintiffs were required to *plead* an element they need not even *prove* to prevail on

26 summary judgment.  *See Swierkiewicz*, 534 U.S. at 511-12.

27     In addition, under Ninth Circuit precedent, the similarly situated element may

28 not apply at all in the commercial, non-employment context present here.  *Lindsey*,

MILLER BARONDESS, LLP

ATTORNEYS AT LAW

1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067

TEL: (310) 552-4400    FAX: (310) 552-8400

1  447 F.3d at 1145 (cautioning against applying the similarly situated element in the

2  commercial context because it may be "too rigorous in the context of the denial of

3  services by a commercial establishment, because customers often have no way of

4  establishing what treatment was accorded to other customers"); *see also*

5  *Swierkiewicz*, 534 U.S. at 512 ("[T]he precise requirements of a prima facie case can

6  vary depending on the context . . . ."). Since *Lindsey*, numerous courts have held

7  that a plaintiff need not allege facts regarding similarly situated individuals in order

8  to state a claim under § 1981. *E.g.*, *Lanier v. Clovis Unified Sch. Dist.*, 2010 WL

9  3733953, at *7 (E.D. Cal. Sept. 20, 2010) ("Where the contract in question is

10  commercial and not employment, courts of this circuit have modified the *McDonnell*

11  *prima facie* elements by omitting the last element."); *Clemons v. Keller Williams*

12  *Realty, Inc.*, 2012 WL 994623, at *2 (C.D. Cal. Mar. 23, 2012).

13       This case exemplifies why the similarly situated element should not apply at

14  the pleading stage. Comcast's carriage agreements with other content providers—

15  similarly situated or otherwise—are not publicly available. Indeed, in connection

16  with the recent merger proceedings before the FCC, such agreements were treated as

17  "highly confidential," and third parties were not allowed to review them except in

18  connection with the merger proceedings. (RJN Ex. B at 3, 6 [Second Amended

19  Modified Joint Protective Order (Nov. 12, 2014)].) Comcast cannot, on the one

20  hand, keep its carriage agreements under lock and key and, on the other hand, fault

21  Plaintiffs for failing to include specific allegations regarding Comcast's carriage

22  agreements with other companies.

23       The similarly situated determination is a "fact-intensive inquiry" not

24  appropriate for resolution on a motion to dismiss. *Hawn v. Exec. Jet Mgmt., Inc.*,

25  615 F.3d 1151, 1157 (9th Cir. 2010). Comcast put forth an extensive list of factors

26  it contends the Court should look to in determining whether television channels are

27  similarly situated, including "the nature of the programming, target audience, ratings

28  and consumer interest, or the 'look and feel' of the network." (Mot. to Dismiss at

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

11.[5])  This demonstrates the fact-intensive nature of the inquiry, which cannot be resolved on a Rule 12(b)(6) motion.

### 2. Plaintiffs Need Not Exclude All Possible Alternative Explanations for Comcast's Conduct

Comcast claims that the FAC does not state a plausible § 1981 claim because Plaintiffs have not excluded the possibility of an alternative explanation for Comcast's refusal to contract with ESN.  (Mot. to Dismiss at 15-18.)  But the case law is clear that a plaintiff need not, in all contexts (and certainly not in discrimination cases), exclude all possible alternative explanations for the defendant's conduct.

For example, in *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1106 (9th Cir. 2013), the plaintiffs brought a Securities Act claim which required them to allege that they purchased shares that were traceable to a misleading registration statement.  In that context, the court was "faced with two possible explanations, *only one of which* [could] be true":  Either the shares came from the secondary offering at issue in the complaint or they came from some other pool of previously issued shares.  *Id.* at 1108 (emphasis added).  In that scenario, the Ninth Circuit required "something more" than allegations that were "merely consistent" with the plaintiff's favored explanation.  *Id.*  The court indicated that "something more" might include allegations excluding the possibility of the alternative explanation.  *Id.* ("Something more is needed, *such as* facts tending to exclude the possibility that the alternative explanation is true." (emphasis added)).

Unlike in *Century Aluminum*—where either the shares were traceable to the misleading registration statement or they were not—there are not two mutually

---

[5] Notably, the case Comcast relies on in support of its list of relevant factors was not decided on a motion to dismiss.  *See Herring Broad., Inc. v. FCC*, 515 F. App'x 655, 656-57 (9th Cir. 2013) (reviewing final FCC determination under "substantial evidence" standard of review).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   exclusive possibilities here. The FAC alleges facts supporting Plaintiffs' claim that

2   Comcast's decision was motivated by race; Comcast disputes this, claiming its

3   decision was motivated by business reasons. *This factual dispute cannot be*

4   *adjudicated on a motion to dismiss.* When a court is faced with competing,

5   plausible explanations, a motion to dismiss should be denied. *Starr v. Baca*, 652

6   F.3d 1202, 1216 (9th Cir. 2011).

7         Here, Plaintiffs have put forth a plausible explanation for Comcast's refusal to

8   deal with ESN—Comcast did not want to do business with ESN because its owner,

9   Byron Allen, is African American. This explanation is supported by Plaintiffs'

10   well-pleaded factual allegations regarding Comcast's utter failure to do business

11   with African American–owned media companies over the years; the discriminatory

12   demands Comcast places on African American–owned media companies; the

13   imposition of dual paths for carriage; and Comcast's own admission that ESN's

14   content is "good enough" for Comcast's system, but that ESN's only opportunity for

15   carriage was through the discriminatory MOU Process. Comcast's purported

16   "business reasons" for refusing to deal with ESN are not "so convincing" that

17   Plaintiffs' competing explanation is "*im*plausible." *Starr*, 652 F.3d at 1216.

### 3.     The First Amendment Does Not Immunize Comcast's Racial Discrimination in Contracting for Carriage

20         Comcast argues that it has free reign to intentionally discriminate against ESN

21   because the First Amendment protects carriage decisions of television distributors.

22   (Mot. to Dismiss at 18.) This is wrong. Comcast's argument rests on a fundamental

23   misunderstanding of the role the First Amendment plays in the cable industry.

24         Plaintiffs agree that cable distributors, such as Comcast, are engaged in some

25   level of protected speech when making programming decisions. *Turner I*, 512 U.S.

26   at 636. But this First Amendment right is not absolute. Indeed, the Supreme Court

27   has twice opined on the interplay between the First Amendment and cable

28   distributors' channel carriage decisions; both times, the Supreme Court found that

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    carriage decisions may be regulated consistent with the First Amendment.

2        In *Turner I*, the Supreme Court considered a First Amendment challenge to

3    FCC regulations requiring cable television distributors to carry broadcast channels

4    on their distribution systems (the "must-carry provisions").  The Supreme Court

5    held that intermediate scrutiny applied because the must-carry provisions were

6    content neutral—*i.e.*, they conferred rights on broadcast networks "irrespective of

7    the content of their programming."  *Turner I*, 512 U.S. at 647.  The same is true with

8    respect to § 1981 in this case—it prohibits Comcast from making carriage decisions

9    on the basis of race, regardless of the content of ESN's programming.

10        The Supreme Court later upheld the must-carry regulations under

11    intermediate scrutiny in *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180

12    (1997).  So too should § 1981's application to this case be upheld under

13    intermediate scrutiny.  Section 1981's goal of prohibiting racial discrimination in

14    contracting is a laudable and substantial government interest unrelated to the

15    suppression of speech, and § 1981's incidental burden on speech is no greater than

16    necessary to further this purpose.  *Turner I*, 512 U.S. at 662 (quoting *United States*

17    *v. O'Brien*, 391 U.S. 367, 377 (1968)).

18        A year after *Turner I*, in a unanimous opinion, the Supreme Court again

19    recognized that a cable distributor's channel carriage decisions may be regulated

20    consistent with the First Amendment.  In *Hurley v. Irish-American Gay, Lesbian &*

21    *Bisexual Group of Boston*, 515 U.S. 557 (1995), the Supreme Court considered a

22    First Amendment challenge to the application of a state anti-discrimination statute to

23    the selection of participants in a parade.  In striking down the statute because it

24    regulated who could march in the parade—*i.e.*, the parade's content—the Supreme

25    Court specifically contrasted the cable industry from the parade (and other) contexts

26    and said that cable distributors, like Comcast, are in a different position.  *Id.* at 576.

27        This is because a *cable distributor's* selection of channels to carry on its

28    platform does not communicate an "overall message" to viewers and is not

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

"understood to contribute something to a common theme." *Id.* at 576-77.  Cable distributors, such as Comcast, serve as *conduits* for the speech of others; there is no risk viewers will assume Comcast endorses the programming it distributes.  *Id.*

In support of its flawed First Amendment argument, Comcast cites a Middle District of Tennessee decision that considered the interplay between § 1981 and the First Amendment in a wholly different context—content *production* as opposed to cable *distribution.*  (Mot. to Dismiss at 18 [*citing Claybrooks v. Am. Broad. Cos., Inc.*, 898 F. Supp. 2d 986 (M.D. Tenn. 2012)].)  In that "specific context," *Claybrooks* held that "§ 1981 regulate[d] speech based on its content—*i.e.*, the race(s) of the Shows' respective cast members." *Claybrooks*, 898 F. Supp. 2d at 993.

Importantly, the plaintiffs in *Claybrooks* alleged not only that the defendants discriminated on the basis of race in making casting decisions, but that they did so for the purpose of conveying a specific message regarding interracial relationships—an allegation that implicates the content of speech. *See id.* at 997.  But here, the FAC alleges the opposite:  Comcast's refusal to contract with ESN had nothing to do with the message Comcast intended to convey.  And ESN's African American ownership has nothing to do with the content of its programming, which has general audience appeal.  Thus, applying § 1981 to prohibit Comcast from making race-based carriage decisions does *not* impose a content-based requirement.

Comcast's reliance on *Claybrooks* is unavailing.  Comcast is not a content producer; it is a cable distributor—a conduit—transmitting creative content that is produced by others.  Under the Supreme Court's decisions in *Turner I* and *Hurley*, the application of § 1981 to Comcast's carriage decisions does not run afoul of the First Amendment.

//

//

//

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Comcast's motion to dismiss the FAC in its entirety.

DATED:  November 20, 2015          MILLER BARONDESS, LLP


By:    /s/ Louis R. Miller
       LOUIS R. MILLER
       Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400