MIGUEL A. ESTRADA, *Pro Hac Vice*
  mestrada@gibsondunn.com
MICHAEL R. HUSTON, SBN 278488
  mhuston@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8257
Facsimile: 213.530.9616

DOUGLAS M. FUCHS, SBN 196371
  dfuchs@gibsondunn.com
JESSE A. CRIPPS, SBN 222285
  jcripps@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Defendant
COMCAST CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF AFRICAN-AMERICAN OWNED MEDIA, a California limited liability company; and ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>COMCAST CORPORATION, a Pennsylvania corporation; TIME WARNER CABLE INC., a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | **CASE NO. 2:15-cv-01239-TJH-MAN**<br><br>**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT BY DEFENDANT COMCAST CORPORATION**<br><br>Judge: Hon. Terry J. Hatter, Jr.<br>Hearing Date: December 28, 2015<br>Time: UNDER SUBMISSION<br>Courtroom: 17 |

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 3

    A.    The FAC's Few New Allegations Do Nothing To Establish That Comcast Discriminated Against ESN On The Basis Of Race .................... 3

        1.    Plaintiffs Have Not Pled Facts Establishing That Comcast Discriminated Against Any Minority-Owned Channels In The Past ................................................................................................ 3

        2.    Plaintiffs' Sparse Allegations About Comcast's Diversity Councils Do Not Remotely Suggest That Comcast Discriminated Against ESN ............................................................. 8

    B.    The FAC Repeats Exactly The Same Allegations That This Court Already Held Fail To State A Claim For Intentional Race Discrimination ................................................................................................ 9

    C.    The First Amendment Protects Comcast's Editorial Discretion In Determining Which Content To Air ......................................................... 13

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Vivo Inc.*,
  No. 12-01854, 2012 WL 5525315 (N.D. Cal. Nov. 14, 2012) .................................. 7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................... 3, 4, 6, 10, 12, 13

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ............................................................... 10, 11, 12

*Comcast Cable Commc'ns, LLC v. FCC*,
  717 F.3d 982 (D.C. Cir. 2013) ............................................................. 11, 13, 14

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) ................................................................. 1, 3, 4, 6, 10

*Garber v. Mohammadi*,
  No. 10-7144, 2013 WL 4012633 (C.D. Cal. Aug. 6, 2013) ........................................ 7

*Ghosh v. Uniti Bank*,
  566 F. App'x 596 (9th Cir. 2014) ................................................................... 11, 13

*Han v. Univ. of Dayton*,
  541 F. App'x 622 (6th Cir. 2013) ................................................................... 11, 13

*Heyne v. Caruso*,
  69 F.3d 1475 (9th Cir. 1995) ............................................................................. 4

*Spulak v. K Mart Corp.*,
  894 F.2d 1150 (10th Cir. 1990) .......................................................................... 4

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994) ......................................................................................... 13

**Statutes**

42 U.S.C. § 1981 ................................................................................................ 14

47 U.S.C. § 536(a)(1) ........................................................................................... 5

**Regulations**

47 C.F.R. § 76.1302 ................................................................................................... 5

# INTRODUCTION

Like late night TV, Plaintiffs' First Amended Complaint is almost all reruns. This Court has already considered all of Plaintiffs' allegations about a supposedly "discriminatory" MOU contracting process, about Comcast's alleged "bait and switch" regarding ESN's application for carriage, about supposed "pretextual" reasons for refusing to carry ESN, and about purported "similarly situated white-owned" companies that allegedly were treated better than ESN but still remain unidentified by Plaintiffs.  And this Court has already held that *none* of those allegations, alone or together, state "any plausible claim for relief."  Dkt. 42 at 3.  Yet those very same allegations make up the overwhelming majority of the FAC.  Not surprisingly, then, Plaintiffs' Opposition largely repeats the very same arguments that they advanced last time around, and that this Court has already rejected.

Plaintiffs have again failed to state any plausible claim for racial discrimination because there is an "obvious alternative explanation"—that Comcast declined to carry ESN's channels for legitimate business reasons—and Plaintiffs have alleged no "facts tending to exclude the possibility that the alternative explanation is true." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996–97 (9th Cir. 2014) (citations and quotation marks omitted).  As documented in publicly available sources, Comcast does not have unlimited bandwidth and exercises editorial discretion to add only those channels that meaningfully improve its programming lineup.  ESN's content simply did not fit that bill, and nothing Plaintiffs have alleged remotely suggests that racial bias was actually the true explanation for Comcast's conduct.

Because the FAC contains no new allegations regarding Comcast's treatment of ESN, Plaintiffs' Opposition highlights the FAC's handful of new allegations about Comcast's interactions with *other* companies.  Comcast's alleged treatment of these unrelated companies has nothing to do with Plaintiffs' claim that Comcast intentionally discriminated against ESN on the basis of race.  Moreover, Plaintiffs' scant allegations about the Soul Train Network, Black Family Channel, and the HBCU Network fail

even to suggest, much less establish, that they were victims of racial discrimination. Indeed, these conclusory allegations of discrimination are of the exact same variety as Plaintiffs' insufficient allegations regarding ESN, as they simply assume that Comcast must have been motivated by racial bias and contain no facts excluding the obvious alternative explanation that Comcast was motivated by legitimate business reasons. And while Plaintiffs claim Comcast has "gone to great lengths to avoid doing business with African American-owned media companies," Opp. at 6, the FAC itself establishes that Comcast does contract with African American content providers, including the Africa Channel, which even Plaintiffs concede meets their contrived "100% African American owned" category. FAC ¶¶ 53, 75–76.

The only other new allegations in the FAC concern Comcast's Diversity Advisory Councils, which Plaintiffs assert in conclusory fashion are "shams" because they lack "any real authority to 'advise' Comcast as to its diversity initiatives." FAC ¶ 41. Plaintiffs have never explained what it means to lack authority to advise a company (*i.e.*, make nonbinding recommendations) on matters of diversity. In any event, the FAC contains no facts to support Plaintiffs' characterization of these Councils. And more fundamentally, the precise degree of influence that the Diversity Advisory Councils have on Comcast says nothing at all about whether Comcast declined to carry ESN's content for legitimate business reasons.

This lawsuit has always been a frivolous attempt to use this Court's docket to garner media attention for ESN's owner, Byron Allen, as is obvious from the ridiculous demand for twenty billion dollars in damages, the inflammatory rhetoric that has filled Plaintiffs' submissions to this Court, and the ludicrous assertion of a conspiracy theory in which the NAACP, the National Urban League, the National Action Network, Al Sharpton, and an FCC Commissioner all intentionally decided to facilitate discrimination against African Americans. It is now abundantly clear that Plaintiffs cannot allege facts to support their irredeemably implausible claims. The Court should dismiss this action with prejudice.

# ARGUMENT

## A. The FAC's Few New Allegations Do Nothing To Establish That Comcast Discriminated Against ESN On The Basis Of Race

After concluding that Plaintiffs had failed to allege sufficient facts to support their claim that Comcast discriminated against ESN on the basis of race, this Court gave Plaintiffs an opportunity to file an amended complaint. Plaintiffs, however, alleged no additional facts concerning Comcast's treatment of ESN, and instead largely recycled the same allegations that this Court already considered and found to be insufficient. What little that is new in the FAC does nothing to make Plaintiffs' claims of discrimination any more plausible. The sparse allegations concerning *other* networks that assertedly are African American owned do not plausibly suggest that Comcast discriminated against those networks, much less that Comcast specifically discriminated against ESN. Plaintiffs' other new allegation—that Comcast's Diversity Advisory Councils are "shams," FAC ¶ 41—is similar to the original complaint's insufficient allegation that Comcast has allegedly failed to satisfy its other MOU commitments, and, in any event, has nothing to do with Comcast's treatment of ESN.

### 1. Plaintiffs Have Not Pled Facts Establishing That Comcast Discriminated Against Any Minority-Owned Channels In The Past

Plaintiffs argue that the FAC's allegations concerning the Soul Train Network, Black Family Channel, and the HBCU Network support an inference that Comcast discriminated against ESN. Opp. at 12. But when Plaintiffs' conclusory allegations of discrimination are set aside—as they must be, *see Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009)—there is nothing left to plausibly show that Comcast discriminated against any of these other companies, as Plaintiffs have alleged no facts to exclude the "obvious alternative explanation" that Comcast was motivated by legitimate business reasons rather than racial bias. *Eclectic Props.*, 751 F.3d at 996–97 (citations and quotation marks omitted).

Plaintiffs' allegations are essentially indistinguishable from their conclusory allegations of discrimination against ESN. Plaintiffs argue that their allegations of discrimination against these other networks are not conclusory because they specified "the who," "the what," and "the when." Opp. at 11 n.1. But those details are patently insufficient to shed the conclusory label. Indeed, the conclusory allegations in *Iqbal* specified the who, the what, and the when: John Ashcroft and Robert Mueller subjected Iqbal to harsh conditions "'solely on account of [his] religion, race, and/or national origin'" in the months after the September 11th terrorist attacks. 556 U.S. at 680–81 (citation omitted). Plaintiffs' allegations of discrimination are thus as conclusory as the ones in *Iqbal*. And when those conclusory allegations of discrimination are set aside, what Plaintiffs have alleged fails to exclude the "obvious alternative explanation" that Comcast declined to carry these networks, just as it has declined to carry hundreds of other networks, for legitimate business reasons. *Eclectic Props.*, 751 F.3d at 996–97 (citations and quotation marks omitted).

Because of the insufficiency of their allegations of discrimination against these other companies, cases like *Heyne v. Caruso*, 69 F.3d 1475 (9th Cir. 1995), and *Spulak v. K Mart Corp.*, 894 F.2d 1150 (10th Cir. 1990), are of no help to Plaintiffs. *See* Opp. at 12. Both cases hold that an employer's past conduct may be relevant and admissible evidence regarding the issue of discriminatory motive. *See Heyne*, 69 F.3d at 1479−80; *Spulak*, 894 F.2d at 1156. For instance, "conduct tending to demonstrate hostility to a certain group" may demonstrate a discriminatory motive toward that group. *Heyne*, 69 F.3d at 1479. But none of Plaintiffs' factual allegations about Soul Train Network, Black Family Channel, or the HBCU Network even remotely demonstrates hostility toward African American owned networks, let alone excludes the obvious alternative explanation that Comcast was motivated by legitimate business reasons.

***Soul Train Network.*** Plaintiffs allege that, at some unspecified date, Comcast "refused to do business with Don Cornelius Productions, a 100% African American-

owned media company that wanted to launch a Soul Train network." FAC ¶ 94. Plaintiffs offer no details about the circumstances surrounding Comcast's supposed refusal to do business with Don Cornelius Productions. And their explanation of how these allegations support an inference of discrimination against ESN is similarly thin: they merely assert that the allegations "bolster [their] claim that Comcast has a pattern and practice" of discrimination, without any explanation for why that is so. Opp. at 11. Plaintiffs have alleged no facts to establish that Comcast's treatment of the Soul Train Network had anything to do with racial bias, rather than legitimate business reasons.

***Black Family Channel.*** In direct contradiction to Plaintiffs' contention that Comcast refuses to do business with African American owned media companies, "[f]rom its launch in 1999 until 2002, the Black Family Channel was distributed to millions of viewers on Comcast's television system." FAC ¶ 84. Plaintiffs, however, allege that Comcast eventually demanded "a significant ownership interest" in Black Family Channel in order to "guarantee" the network's "continued carriage on Comcast's systems," but did not make comparable demands of "similarly situated, white-owned networks." FAC ¶¶ 84, 86. When Black Family Channel refused, Comcast allegedly "began retaliating"—for instance, by limiting the network's expansion and downgrading its tier placement—which led to the network's "demise." FAC ¶¶ 85, 87. These allegations are implausible on their face: federal law and FCC regulations prohibit cable operators from "requir[ing] a financial interest in any program service as a condition for carriage[,]" and authorize aggrieved parties to complain to the FCC. 47 U.S.C. § 536(a)(1); *see also* 47 C.F.R. § 76.1302. Conspicuously absent from the FAC is any allegation that Black Family Channel ever complained to the FCC about Comcast's purported demands.

But even if credited, Plaintiffs' allegations about Comcast's demands do not plausibly support Plaintiffs' contention that Comcast engaged in *racial* discrimination. Plaintiffs' allegation that Comcast did not demand an ownership interest from "similarly situated, white-owned networks," FAC ¶ 86, is a legal conclusion that is not

entitled to a presumption of truth—just like Plaintiffs' prior allegation that ESN was treated worse than similar white-owned networks, which this Court already found to be insufficient. *See Iqbal*, 556 U.S. at 679. Comcast's treatment of Black Family Channel is entirely consistent with the obvious alternative explanation that the channel performed poorly and that Comcast rationally responded by limiting the network's reach and prominence on Comcast's system. *See Eclectic Props.*, 751 F.3d at 996–97. This is not a "factual disagreement," Opp. at 11, because Plaintiffs have utterly failed to allege *facts* to support their contention that Comcast discriminated against Black Family Channel on the basis of race.

  ***HBCU Network.*** Plaintiffs allege that Comcast and HBCU Network were "moving forward to finalize the terms of a carriage deal," when Comcast "pulled the rug out from under the network" and told it to "proceed via the MOU Process." FAC ¶¶ 91–92. Plaintiffs contend that HBCU Network's "only opportunity for carriage would be through the MOU Process." Opp. at 12. These allegations are essentially identical to Plaintiffs' allegations concerning ESN—which this Court has already deemed insufficient to state any plausible claim. *See* Mot. at 7. Plaintiffs concede the point when they say that Comcast's supposed treatment of HBCU Network "mirrors" Comcast's treatment of ESN. Opp. at 12. Indeed, both sets of allegations rely on the same distorted view that the MOU excludes minority-owned networks from Comcast's normal carriage process, even though the MOU itself contains no such restriction and manifestly is designed to provide *additional* carriage opportunities for minority-owned channels. *See* Dkt. 29-3, Ex. A at 9. Thus, while Plaintiffs say that this similarity "supports" their claim of discrimination against ESN, Opp. at 12, the opposite is true. Two equally implausible claims of discrimination do not add up to a plausible one.

* * *

  To infer discrimination against ESN based on Plaintiffs' cursory assertions that Comcast has previously declined to carry certain African American owned networks (or in the case of Black Family Channel, changed the extent of its carriage) would

violate the requirements of *Iqbal*. For instance, a plaintiff could transform a conclusory allegation of employment discrimination into a plausible claim simply by alleging that her employer fired another member of the same race ten years ago, coupled with a legal conclusion that it treated others differently. That is not the law. *See, e.g.*, *Garber v. Mohammadi*, No. 10-7144, 2013 WL 4012633, at *13 (C.D. Cal. Aug. 6, 2013) ("Far from alleging facts that establish the grounds for a plausible entitlement to relief, plaintiff merely asserts that such a 'history' and 'pattern' [of discrimination] exists."); *Adams v. Vivo Inc.*, No. 12-01854, 2012 WL 5525315, at *4 (N.D. Cal. Nov. 14, 2012) ("bare conclusion about the 'history of discrimination'" is insufficient to demonstrate discriminatory intent).

Furthermore, this case does not involve a situation where a company has consistently refused to do business with any African American companies. Indeed, the FAC itself makes clear that Comcast contracts with African American content providers, including the 100% African American owned Africa Channel. *See* FAC ¶¶ 53, 75–76. While Plaintiffs attempt to explain away Comcast's carriage of the Africa Channel as the product of a deal with a former "Comcast insider," Opp. at 13 n.2, if Plaintiffs' claim of a pattern of discrimination against African Americans were plausible, Comcast would not have African American "insiders." Moreover, Plaintiffs allege no facts to suggest that the Africa Channel obtained carriage with Comcast only because of this purported "insider" connection, let alone facts to suggest that African American owned media companies *must* have similar "insider" connections in order to successfully license their content to Comcast. Yet even if the Court were to accept Plaintiffs' conclusory allegations about Comcast's carriage of the Africa Channel, that would at most establish that Comcast discriminates in favor of "insiders" and those

channels in which "it has a stake in the game," Opp. at 13 n.2, not that it discriminates on the basis of *race*.[1]

### 2. Plaintiffs' Sparse Allegations About Comcast's Diversity Councils Do Not Remotely Suggest That Comcast Discriminated Against ESN

Plaintiffs' only other new allegations are that the Diversity Advisory Councils that Comcast established pursuant to the MOU are "shams" because they lack "any real authority to 'advise' Comcast as to its diversity initiatives[.]" FAC ¶ 41. In the first place, Plaintiffs do not explain what it would even mean for these Councils to lack "authority" to make nonbinding recommendations regarding diversity. Moreover, these allegations are merely another way of saying that Comcast has failed to meet the diversity goals that it voluntarily undertook in the MOU. This Court, however, has already determined that Plaintiffs' other allegations along these lines—concerning the networks that Comcast has launched under the MOU—are insufficient to raise a plausible inference of discrimination against ESN. *See* Mot. at 13–15. What is more, these allegations are belied by Comcast's compliance reports to the FCC. *See* Dkt. 57-3, Ex. 1 at 23.

Plaintiffs' response takes aim at these FCC compliance reports, which they claim "contain misstatements." Opp. at 16. But that assertion—essentially, that Comcast lied to the FCC—is once again a conclusory one, not entitled to a presumption of truth. Plaintiffs also contend that nothing in the 2013 report "actually contradicts the FAC." *Id.* Not so. While the FAC alleges that the councils have "no

---

[1] Even though the FAC is clearly focused on Plaintiffs' unique claim of discrimination against the novel category of "100% African American owned" media companies, *see* FAC ¶¶ 2, 7–8, 13, 25–26, 50, 62, 67, 75, 80–81, 85, 93–94, 97, Plaintiffs assert for the first time in their Opposition that they are actually "claiming discrimination against majority or substantial African American-owned channels." Opp. at 14 n.3. Regardless of Plaintiffs' shifting defenses of their insufficient allegations, Comcast's carriage of the Africa Channel proves that it does not discriminate against African American owned media companies—whether that ownership is substantial, majority, or 100%.

real authority to 'advise' Comcast as to its diversity initiatives," FAC ¶ 41, the 2013 report says that the Councils "pla[y] a significant role in advising on the Company's diversity and inclusion efforts."  Dkt. 57-3, Ex. 1 at 23.  Yet even if it were true that Comcast has not made sufficient progress on its diversity efforts, that would not establish that Comcast discriminated against ESN on the basis of race.[2]

### B. The FAC Repeats Exactly The Same Allegations That This Court Already Held Fail To State A Claim For Intentional Race Discrimination

The remaining allegations in the FAC set forth the same exact contentions as Plaintiffs' original complaint.  Plaintiffs offer the same conclusory assertions of discrimination, *e.g.*, FAC ¶¶ 56, 61, 62, 64, 98, the same distortions of the MOU, *e.g.*, FAC ¶¶ 42–49, along with the same baseless assertions about Comcast's efforts to implement the MOU, *e.g.*, FAC ¶¶ 50–55.  In the end, Plaintiffs still fail to allege any facts tending to exclude the obvious nondiscriminatory explanation that Comcast exercised its business and editorial discretion in declining to carry ESN's programming.

*The MOU.*  Plaintiffs admit that the MOU on its face "purports to benefit media companies with 'majority or substantial' African American ownership."  Opp. at 15 (emphasis omitted).  The MOU affords those companies additional opportunities to obtain carriage, as Comcast committed to launching four networks "in which African Americans have a majority or substantial ownership interest."  Dkt. 29-3, Ex. A at 9.  The MOU nowhere excludes networks owned by African Americans from Comcast's normal carriage process.

---

[2] Plaintiffs refer to a letter by the Congressional Black Caucus urging the FCC to "take steps to protect media diversity" and criticizing as a general matter past pledges to protect media diversity.  Opp. at 2–3 (citing Dkt. 59-3).  This letter, however, is irrelevant to the sufficiency of the FAC, as it is not mentioned anywhere in the FAC.  Moreover, the letter says nothing about Comcast's diversity efforts under the MOU, much less Comcast's treatment of ESN specifically.

Despite that, Plaintiffs contend that the MOU is "the *only* avenue" for African-American owned companies to obtain carriage, citing the experiences of ESN and HBCU Network. Opp. at 15. This Court has already rejected that same argument as to ESN, and the same should hold true as to HBCU Network. In both instances, Plaintiffs allege facts that are consistent with an obvious nondiscriminatory explanation—supported by the plain import of the MOU—that Comcast considered each network for carriage, ultimately passed, and then afforded each network an *additional* opportunity to be considered under the MOU process, before passing again in favor of other networks. Plaintiffs allege no *facts* suggesting otherwise, but instead rely on conclusory assertions of discrimination and a charge that Comcast's newly partnered *Revolt* and *Aspire* channels are not "black enough" for Plaintiffs' liking. In light of such weak allegations, "discrimination is not a plausible conclusion." *Iqbal,* 556 U.S. at 682.

***Pretext.*** Comcast has demonstrated that the FAC fails to state a plausible claim of discrimination because Plaintiffs allege no facts "tending to exclude the possibility" that Comcast exercised its business and editorial discretion in declining to carry ESN's programming. *Eclectic Props.,* 751 F.3d at 996–97; *In re Century Aluminum Co. Sec. Litig.,* 729 F.3d 1104, 1108 (9th Cir. 2013). Plaintiffs assert that these reasons were "pretextual," Opp. at 16, but they failed to allege facts to support this assertion.

Plaintiffs claim that Comcast told ESN "to obtain support from the Comcast Divisions and Regions," and in doing so, "deliberately [gave] ESN the runaround." Opp. at 17. But the far more plausible explanation is that, although Comcast ultimately declined to contract with ESN for business reasons, it nonetheless seriously considered ESN to the point of advising the company on how to "bolster its carriage request" by seeking support from others within Comcast. FAC ¶ 59.

Plaintiffs also say that Comcast told "ESN that it was only interested in adding carriage for news and sports channels" but then allegedly added other "non-news, non-sports channels." Opp. at 17. Yet Plaintiffs offer no details about these other channels

that would suggest they were similarly situated to ESN's channels in any relevant respect. *Cf. Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982 (D.C. Cir. 2013) (legitimate business reasons supported Comcast's differential carriage of Golf and Tennis channels). These allegations, therefore, cannot support a plausible inference of discrimination. *See, e.g.*, *Ghosh v. Uniti Bank*, 566 F. App'x 596, 597 (9th Cir. 2014); *Han v. Univ. of Dayton*, 541 F. App'x 622, 627 (6th Cir. 2013). Plaintiffs also note that, despite Comcast's desire to add sports channels, it declined to carry HBCU Network, "a channel focused on black college sports." Opp. at 17. But Plaintiffs do not dispute that bandwidth constraints limit Comcast's ability to carry every conceivable news or sports channel, even if Comcast wanted to do so. And so this allegation does not support a plausible inference of discrimination either.

Plaintiffs next contend that "Comcast's legitimate business reasons defense is premature," because that defense is also relevant under the legal framework that would apply at summary judgment. Opp. at 18. Plaintiffs raised the same argument in defense of their original complaint, to no avail. Dkt. 32 at 16. The argument is still meritless because if there exists an "'obvious alternative explanation'" at the pleading stage, then the Supreme Court's decision in *Iqbal* requires a plaintiff to offer more than "allegations that are 'merely consistent with' [its] favored explanation but are also consistent with the alternative explanation.'" *Century Aluminum*, 729 F.3d at 1108 (citations omitted). Thus, if legitimate business reasons are an obvious alternative to discrimination, then the Complaint cannot survive a motion to dismiss without additional facts that tend to negate that alternative.

Plaintiffs further assert that they "need not . . . exclude all possible alternative explanations for the defendant's conduct." Opp. at 21. Plaintiffs again copy this argument from their earlier opposition, and it fares no better the second time around. *Compare* Opp. at 21–22, *with* Dkt. 32 at 12. Comcast does not argue that Plaintiffs must "exclude *all* possible alternative explanations," Opp. at 21 (emphasis added), only that they must exclude an *obvious* alternative explanation apparent from their own

allegations. Indeed, this case is no different than *Iqbal*, where the complaint supplied an obvious, nondiscriminatory explanation and "[a]s between that 'obvious alternative explanation'" and an explanation of "purposeful, invidious discrimination . . . discrimination is not a plausible conclusion." 556 U.S. at 682 (citation omitted). Instead, to raise a plausible inference of discrimination, Plaintiffs must offer "[s]omething more . . . such as facts tending to exclude the possibility that the alternative explanation is true." *Century Aluminum*, 729 F.3d at 1108. Plaintiffs have utterly failed to do so, and their attempt to distinguish *Century Aluminum* as applying only to cases where there are "two mutually exclusive possibilities," Opp. at 21–22, fails because, even on Plaintiffs' telling, the FAC gives rise to two mutually exclusive possibilities here: either Comcast discriminated against ESN, or Comcast denied ESN carriage for legitimate business reasons.

   ***Similarly Situated Networks.*** Plaintiffs do not dispute that they offer no facts concerning the "similarly situated white-owned" networks to which Comcast supposedly gave preferential treatment. Rather, as they did previously, *compare* Opp. at 18–21, *with* Dkt. 32 at 16–19, Plaintiffs contend that "'the similarly situated' element" applies "at the summary judgment stage and at trial[,] not on a motion to dismiss," and that even at those latter stages, a plaintiff is not required to identify similarly situated comparators in order to raise an inference of discrimination (though may do so). Opp. at 19. But under *Iqbal*, Plaintiffs have an obligation at the pleading stage to allege facts sufficient to raise a plausible inference of discrimination, and they have sought to meet that obligation with allegations that Comcast treated similarly situated white-owned networks better than ESN. For instance, Plaintiffs allege that Comcast refuses to contract with ESN but "continue[s] to contract with . . . similarly situated white-owned television channels," FAC ¶ 98, and that the MOU "prevents [ESN] from being treated equally with its non-minority-owned/controlled counterparts," FAC ¶ 73.

  Having sought to rely on allegations of "similarly situated white-owned" networks to support a plausible inference of discrimination, Plaintiffs cannot now disclaim an obligation to supply any facts in support of those allegations. *See, e.g.*, *Ghosh*, 566 F. App'x at 597; *Han*, 541 F. App'x at 627. For that reason, Plaintiffs' assertion that "the similarly situated element may not apply at all in the commercial, non-employment context" is curious, because Plaintiffs themselves rely on that element in support of their non-employment discrimination claim.

  Plaintiffs also assert that they should not have to allege facts about similarly situated comparators at the pleading stage because those facts are under "lock and key." Opp. at 20. But as the Supreme Court explained in *Iqbal*, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"—*e.g.*, Plaintiffs here. 556 U.S. at 678–79.

## C. The First Amendment Protects Comcast's Editorial Discretion In Determining Which Content To Air

  Dismissal is also warranted for the independent reason that, through this action, Plaintiffs are impermissibly attempting to regulate Comcast's First Amendment right to exercise its editorial discretion to select which channels of content to transmit to its subscribers. *See* Mot. at 18. Plaintiffs themselves "agree that cable distributors, such as Comcast, are engaged in some level of protected speech when making programming decisions." Opp. at 22. Plaintiffs are forced to concede this premise because the Supreme Court has held that "[c]able programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 636 (1994); *see also Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 993 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("Just as a newspaper exercises editorial discretion over which articles to run, a video programming distributor exercises editorial discretion over which video programming networks to carry and at what level of carriage.").

Plaintiffs nonetheless argue that their claim is akin to the content-neutral regulations upheld in *Turner*. *See* Opp. at 23. But nothing about Plaintiffs' claim is content neutral. Indeed, the core allegation in Plaintiffs' complaint is that Comcast declined to carry ESN's content, and instead chose to distribute the content of other providers. Plaintiffs are thus attempting to have this Court permit burdensome litigation against, and potentially impose liability on, Comcast for what is the exercise of editorial judgment over which content to transmit to subscribers. While 42 U.S.C. § 1981 may be applied in content-neutral fashions in other contexts, Plaintiffs' attempted use of that statute here to force Comcast to carry a specific set of content is a direct infringement of Comcast's First Amendment rights.

Plaintiffs also contend that Comcast and other cable distributors are entitled to a lower level of First Amendment protection than other entities. Opp. at 23–24. But the Supreme Court decisions Plaintiffs rely on held only "that the Government may interfere with a video programming distributor's editorial discretion only when the video programming distributor possesses market power in the relevant market," and "[i]n today's highly competitive market, neither Comcast nor any other video programming distributor possesses market power in the national video programming distribution market." *Comcast*, 717 F.3d at 994 (Kavanaugh, J., concurring). Therefore, the Government "cannot tell Comcast how to exercise its editorial discretion about what networks to carry any more than the Government can tell Amazon or Politics and Prose or Barnes & Noble what books to sell; or tell the *Wall Street Journal* or *Politico* or the *Drudge Report* what columns to carry; or tell the MLB Network or ESPN or CBS what games to show; or tell *SCOTUSblog* or *How Appealing* or *The Volokh Conspiracy* what legal briefs to feature." *Id.*

# CONCLUSION

Plaintiffs have not sought leave to amend in their Opposition, and no amendment would cure the defects that remain in the FAC. This Court should dismiss Plaintiffs' FAC with prejudice for failure to state any plausible claim.

DATE: December 11, 2015          GIBSON, DUNN & CRUTCHER LLP

By:   /s/ Miguel A. Estrada

MIGUEL A. ESTRADA
DOUGLAS M. FUCHS
JESSE A. CRIPPS
BRADLEY J. HAMBURGER
MICHAEL R. HUSTON

Attorneys for Defendant
COMCAST CORPORATION