LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
BRIAN PROCEL (State Bar No. 218657)
bprocel@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 552-4400
Facsimile:    (310) 552-8400

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

NATIONAL ASSOCIATION OF
AFRICAN AMERICAN–OWNED
MEDIA, a California limited liability
company; and ENTERTAINMENT
STUDIOS NETWORKS, INC., a
California corporation,

        Plaintiffs,

    v.

COMCAST CORPORATION, a
Pennsylvania corporation; and DOES 1
through 10, inclusive,

        Defendants.

**CASE NO. 2:15-cv-01239-TJH-MAN**

**SECOND AMENDED COMPLAINT
FOR RACIAL DISCRIMINATION
IN VIOLATION OF 42 U.S.C.
§ 1981; AND FOR DAMAGES AND
INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Plaintiffs National Association of African American–Owned Media ("NAAAOM") and Entertainment Studios Networks, Inc. ("Entertainment Studios") allege against Defendants Comcast Corporation ("Comcast") and DOES 1 through 10, inclusive, (collectively, "Defendants") as follows:

## INTRODUCTION

1.      Plaintiffs bring this lawsuit to remedy harm caused by Defendant Comcast's racially discriminatory refusal to contract with Plaintiff Entertainment Studios, a 100% African American-owned media company, in violation of Plaintiff's civil rights under the Civil Rights Act of 1866, 42 U.S.C. §1981.

2.      Plaintiff Entertainment Studios owns and operates seven different 24-hour per day television networks which are currently distributed to nearly 80 million cumulative pay television subscribers in nearly every zip code in the United States. These networks include Emmy-nominated and Emmy-award winning shows and talent, and original programming featuring well-known celebrities, all of which help to increase market demand for the networks.

3.      Defendant Comcast is the largest cable television company, and has the highest number of pay television cable subscribers, concentrated primarily in highly African American-populated urban cities in the United States.  Comcast currently generates approximately $40 billion in annual revenue from television subscribers, approximately $16 billion of which comes from African American subscribers. Comcast does not carry any 100% African American-owned television networks, not to be confused with African American "targeted" networks (e.g., Black Entertainment Television, or BET, which is owned by the conglomerate Viacom).

4.      A majority of Comcast's main competitors—including Verizon FIOS, AT&T U-verse and DirecTV—all carry Entertainment Studios' networks.  Like DirecTV, AT&T U-verse, and Verizon FIOS, there are more than 50 other television distributors (in the industry, these are known as multichannel video programming distributors ("MVPDs")) who carry Entertainment Studios' networks

1 because of market demand. The networks can be seen by nearly 80 million

2 cumulative pay television subscribers.

3      5.     Entertainment Studios has met and spoken with senior Comcast

4 executives responsible for licensing television networks on numerous occasions

5 beginning as early as 2008 and as recently as 2015 to license the Entertainment

6 Studios networks for availability to Comcast's pay television subscribers. Comcast

7 has repeatedly used disingenuous and pretextual excuses to carry out its racist

8 agenda.

9      6.     Comcast's refusal to carry Entertainment Studios' networks is

10 unprecedented.  Comcast carries **every single** television network of the

11 approximately 500 networks that are also carried collectively by its main

12 competitors, Verizon FIOS, AT&T U-verse and DirecTV, with one notable

13 exception: the 100% African American-owned Entertainment Studios networks.

14 Because the Entertainment Studios networks have achieved this high level of

15 distribution on Comcast's main competitors, Comcast does not have any legitimate

16 business reason to exclude Entertainment Studios.  .  Race-based discrimination is

17 the only explanation.

18      7.     Comcast has continued to offer bandwidth and network carriage to

19 newer, lesser-known, white-owned television networks (e.g., Inspirational Network,

20 Fit TV, Outdoor Channel, and Current TV) while it has simultaneously told

21 Entertainment Studios it had no bandwidth or carriage availability.  Comcast's

22 years-long refusal to allow its pay television subscribers access to television

23 networks from this 100% African American-owned media company, or any other, is

24 motivated by extreme, unfair, and illegal racial animus.

25      8.     Comcast has given Entertainment Studios a horrible series of

26 unfounded and pretextual excuses (e.g., no bandwidth) to justify its decisions not to

27 carry Entertainment Studios networks, or any other 100% African American-owned

28 networks for nearly 55 years. Comcast itself proves through its own public actions

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

each such excuse to be untrue and misleading.  Comcast provided these excuses in an attempt to conceal its racial bias against Entertainment Studios' sole owner, an African American.  But after years of playing the same games with Entertainment Studios, Comcast's racial bias is no longer concealed – it is out in the open and well-documented by multiple legal complaints and settlements, one recently with its own African American employees.

9.      On more than one occasion, Comcast gave Entertainment Studios the bogus excuse that it did not have enough *"bandwidth"* to carry Entertainment Studios' networks.  However, at all relevant times Comcast had more than enough bandwidth to carry Entertainment Studios' networks as it continued to launch other, newer, lesser-distributed, white-owned networks as noted above.  In fact, Comcast has launched more than 80 such networks at the same time it was telling Entertainment Studios it lacked sufficient bandwidth for Entertainment Studios' networks.

10.     Comcast does not carry any unaffiliated, independent, African American-owned television networks.  None of the networks that Comcast launched, while refusing carriage to Entertainment Studios, were 100% African American-owned.

11.     Comcast also told Entertainment Studios on numerous occasions that there was insufficient demand for Entertainment Studios' networks.  Yet, as detailed above, nothing could be further from the truth.  In fact, Entertainment Studios' networks are carried by the majority of Comcast's competitors, as well as more than 50 other MVPDs.

12.     For years Comcast has engaged, and continues to engage, in the practice of racial discrimination vis-à-vis Plaintiff Entertainment Studios.  Unlike scores of other television network distributors, Comcast has refused to negotiate and contract with Entertainment Studios for carriage of its networks and programming on equal and nondiscriminatory terms.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

13.     Comcast's discriminatory conduct has taken several forms over the years, including bogus corporate run-arounds, unfulfilled promises and patently false pretexts.  More recently, Comcast has embraced an overtly discriminatory approach.  Following its acquisition of NBC/Universal in 2010—during the process of which Comcast's historically racially discriminatory conduct was significantly called into question by Plaintiff, minority groups, the FCC and other governmental agencies—Comcast created two paths for programmers like Entertainment Studios to obtain carriage on its systems: one path is available generally to white-owned-and-controlled programmers; the other, much more limited path is restricted to (supposedly) African American-owned programmers.  To the extent that second path leads to carriage arrangements (only two in five years), those arrangements are inferior to those at the end of the other path.

14.     This segregation of opportunity based on race is *prima facie* discriminatory.  Even more damning is the fact that the path supposedly set aside for the benefit of African American-owned/controlled entities has, after five years, led to carriage of a total of only two channels of programming produced by entities whose claim to African American-ownership and/or control is, at best, highly dubious. In other words, even the separate-but-far-from-equal set-aside opportunity touted as favoring African-American programmers has in actual practice proven to be a sham that reinforces and codifies Comcast's historically institutionalized race discrimination.

15.     Comcast's history of discrimination against African Americans is not limited to Entertainment Studios.  Other African American-owned programmers have suffered similar fates at the hands of Comcast, as detailed below.

16.     By way of illustration of the economic disparities at work here and the real-world consequences of Defendants' discriminatory conduct, Comcast spends approximately $20 billion annually to license the carriage of television networks and to advertise its products and services.  Of that amount, African American–owned

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  media companies receive less than one one-hundredth of one percent (0.01%), or

2  less than $3 million annually.

3    17. These disparities are the result of—and evidence of—long-term,

4  institutionalized racial discrimination in contracting, in violation of the Civil Rights

5  Act of 1866, 42 U.S.C. § 1981.

6  **PARTIES, JURISDICTION AND VENUE**

7  **A.** **Plaintiffs**

8    18. Plaintiff NAAAOM is a California limited liability company, with its

9  principal place of business in Los Angeles, California.

10    19. NAAAOM was created and is working to obtain for 100% African

11  American–owned media the same contracting opportunities enjoyed by their white

12  counterparts for distribution, channel carriage, channel positioning and advertising

13  dollars. Its mission is to secure the economic inclusion of truly African American-

14  owned media in contracting, affording them the same opportunities, on the same

15  terms, as are available to white-owned media.  Historically, unlike their white-

16  owned counterparts, 100% African American-owned media have been excluded

17  from television network distribution, advertising support and other economic

18  benefits.  As a result, 100% African American–owned media have been forced

19  either to (i) give away significant equity in their enterprises, (ii) pay exorbitant sums

20  for network carriage, effectively bankrupting the business, or (iii) go out of business

21  altogether, thereby pushing 100% African American–owned media to the edge of

22  extinction. NAAAOM currently has six members and while it continues to pursue

23  more, the dearth of African American-owned media companies in the United States

24  makes the NAAAOM effort even more important as 100% African American-

25  owned media stands on the brink of extinction (while there will always be African

26  American performers, entertainers, writers, and other people of creative talent, their

27  own ownership of media enterprises is all but non-existent).

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

20.     As alleged herein, Entertainment Studios—a member of NAAAOM—is being discriminated against on account of race in violation of 42 U.S.C. § 1981. Entertainment Studios thus has standing to seek redress for such violations in its own right.  The interests at stake in this litigation—namely, the right of 100% African American–owned media companies to make and enforce contracts in the same manner as their white-owned counterparts—are germane to NAAAOM's purpose.  Because NAAAOM seeks only injunctive relief, the individual participation of its members is not required.

21.     Plaintiff Entertainment Studios Networks, Inc. is a California corporation, with its principal place of business in Los Angeles, California. Entertainment Studios is a 100% African American–owned media company which produces television programming and distributes that programming on over 1,200 broadcast television stations, its own subscription-based Internet service, and through the carriage of its seven separate television networks by cable systems and other MVPDs.  It is the only 100% African American–owned multi-channel media company in the United States which owns and controls multiple television networks, a status it has achieved because most other 100% African American–owned media companies have been shut out and eventually forced out of business.

22.     Entertainment Studios is certified as a *bona fide* Minority Business Enterprise as defined by the National Minority Supplier Development Council, Inc. and as adopted by the Southern California Minority Supplier Development Council.

23.     Entertainment Studios was founded in 1993 by Byron Allen, an African American actor/comedian/media entrepreneur.  Over the last 23 years, Allen has built Entertainment Studios into a vertically-integrated company from the ground up and remains its sole owner.  Entertainment Studios has grown from producing one television series into a company that now produces nearly 40 television series, operates seven 24/7 television networks, operates a full-service, theatrical motion picture production and distribution company, and continues to expand despite being

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  shut out from Comcast's nearly 22 million pay television subscribers.  This

2  remarkable growth has occurred because of the clear and obvious high market

3  demand for Entertainment Studios' programming and networks.

4       24.    Allen is the sole owner of Entertainment Studios.  Allen first made his

5  mark in the television world in 1979, when he was the youngest comedian ever to

6  appear on "The Tonight Show Starring Johnny Carson."  He thereafter served as the

7  co-host of NBC's "Real People," one of the first reality shows on television.

8  Alongside his career "on-screen," Allen developed a keen understanding of the

9  "behind the scenes" television business, and over the past 23+ years he has built

10 Entertainment Studios into the independent media company it now is – a full-service

11 television and motion picture production and distribution company with seven

12 television networks carried by Comcast's main competitors and can be seen in

13 nearly 80 million cumulative homes in the United States.

14      25.    Entertainment Studios has carriage contracts through which its

15 networks are carried to those nearly 80 million cumulative homes on more than 50

16 MVPDs spanning 350 cable systems nationwide.  Among the MVPDs that carry

17 Entertainment Studios' networks are three of the five largest in the country, *i.e.*,

18 Verizon FIOS, AT&T U-verse and DirecTV—as well as dozens of others (including

19 Suddenlink, RCN and CenturyLink).  Verizon FIOS, for instance, has carried

20 Entertainment Studios' networks since 2009.  Verizon FIOS has repeatedly renewed

21 its carriage agreements for the Entertainment Studios networks; and Verizon FIOS

22 has expanded (not reduced) its carriage of Entertainment Studios' networks by

23 adding Entertainment Studios' seventh network, Justice Central.TV, a 24-hour per

24 day court and legal news channel, due to market demand.  Through these carriage

25 arrangements Entertainment Studios' networks are delivered to approximately 80

26 million cumulative subscribers across the country.  This level of distribution in the

27 United States is an unmistakable indication of the market demand for Entertainment

28 Studios' networks.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

26.     Entertainment Studios owns and operates seven high definition television networks (channels), six of which were launched to the public in 2009 and one, Justice Central.TV, in 2012.  Entertainment Studios produces, owns, and distributes nearly 40 television series on broadcast and cable television, with over four thousand hours of television programming in its library.

27.     Despite Comcast's discriminatory refusal to carry Entertainment Studios' networks, Entertainment Studios programming and television networks have viewers nationwide and have been recognized for their excellence within the entertainment industry.  For instance, Entertainment Studios' network Justice Central.TV features Emmy-nominated court shows, including "Justice for All with Judge Cristina Perez," "We the People with Gloria Allred" and "America's Court with Judge Kevin Ross."  Justice Central.TV's Judge Christina Perez has won the Emmy award in three consecutive years.  A copy of an Entertainment Studios promotional presentation highlighting key aspects of the company and the programming it produces is attached hereto as **Exhibit A**.

28.     "Comedy.TV" is another network owned and operated by Entertainment Studios.  Comedy.TV features original sitcoms starring recognizable celebrities, such as Vivica A. Fox, Jon Lovitz, Marla Gibbs, John Witherspoon, Bill Bellamy and Gladys Knight.  And Comedy.TV features marquee comedians such as Dennis Miller, Eddie Murphy, Jim Carrey, Jamie Foxx, Adam Sandler and Tina Fey, among others.  There is a high demand in the marketplace for comedic programming and networks featuring such programming and talent (for instance, Comedy Central, a similar genre network, has been in existence and consistently popular for over 25 years).

29.     Entertainment Studios' other networks include "ES.TV," which includes celebrity and entertainment-related programming.  It provides original content, including interviews with celebrities such as Leonardo Di Caprio, Denzel Washington, Matt Damon, Halle Berry and George Clooney.  There is a high

1  demand in the marketplace for celebrity-driven news and entertainment

2  programming.

3      30.    Entertainment Studios also provides original programming on its other

4  networks, including "Pets.TV," "Recipe.TV," "MyDestination.TV," and Emmy

5  award-winning "Cars.TV."  All of the foregoing Entertainment Studios' networks

6  are carried by Comcast's biggest competitors and all feature subjects, celebrities,

7  stories, and other programming for which there is a high demand in the marketplace.

8  **B.    Defendants**

9      31.    Comcast Corporation is a Pennsylvania corporation, with its principal

10  place of business in Philadelphia, Pennsylvania.  Comcast has its roots in Tupelo,

11  Mississippi, where it was established in 1963.

12     32.    Comcast also has an office, is registered to do business and operates in

13  Los Angeles, California.  Comcast is a global media giant.  It owns NBC Television,

14  Universal Pictures, Universal Studios, multiple (approximately 30) pay television

15  networks (*e.g.*, USA Network, Bravo Network, E! Entertainment, etc.), and it is the

16  largest cable company and Internet service provider in the United States.  Comcast

17  provides subscription television services to approximately 22 million subscribers.  It

18  has monopoly control over the cable market in several major geographic markets

19  across the United States.

20     33.    Since it was established 55 years ago in Tupelo, Mississippi, Comcast

21  has not contracted with any 100% African-American owned television network

22  other than Black Family Channel and the Comcast corporate executive insider-

23  owned Africa Channel.  And in 2000, The Black Family Channel drafted, but did

24  not file, a complaint for racial discrimination in contracting against Comcast in

25  violation of 42 USC §1981.

26     34.    Plaintiffs are informed and believe, and on that basis allege, that

27  Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to

28  Plaintiffs for the wrongs alleged herein.  The true names and capacities, whether

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   individual, corporate, associate or otherwise, of Defendants DOES 1 through 10,

2   inclusive, are unknown to Plaintiffs at this time.  Accordingly, Plaintiffs sue

3   Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this

4   Complaint to allege their true names and capacities after they are ascertained.

5   **C.      Jurisdiction & Venue**

6        35.      This case is brought under a federal statute, § 1981 of the Civil Rights

7   Act; as such, there is federal question jurisdiction under 28 U.S.C. § 1331.  Venue of

8   this action is proper in Los Angeles because Defendants reside in this district, as

9   defined in 28 U.S.C. § 1391; and the acts in dispute were committed in this district.

10                              **FACTS**

11  **A.      Racial Discrimination in the Media**

12       36.      Racial discrimination in contracting for cable carriage is an insidious

13  ongoing practice with far-reaching adverse consequences.  The practice is so

14  extensive that even a top advisor to the Chairman of the Federal Communications

15  Commission ("FCC") candidly told an Entertainment Studios representative that

16  "inherent racism" infects the cable television and broadband industry.  As a result of

17  that discrimination, 100% African American–owned media companies and African

18  American individuals, and their diverse viewpoints, are precluded from access to the

19  broadest possible audience; conversely, such discrimination deprives the U.S.

20  audience of access to that rich diversity.

21       37.      Both Congress and the Supreme Court—and, most recently, the U.S.

22  Court of Appeals for the Third Circuit in *Prometheus Radio Project v. FCC*, Nos.

23  15-3863 *et al.* (May 25, 2016)—have repeatedly emphasized that a diversity of

24  voices and viewpoints in the media advances First Amendment values and, thus, is

25  quintessentially in the public interest and to be encouraged.

26       38.      Both Congress and the judiciary—have recognized the need for

27  diversity in media ownership.  Indeed, the Third Circuit Court of Appeal recently

28  held that the FCC **"**has a statutory obligation to promote minority and female

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

broadcast ownership.**"** *Prometheus Radio Project v.* ).  This statutory obligation stems from the recognition that "inadequate representation of minorities in the broadcast industry was detrimental not only to the minority audience but to all of the viewing and listening public."  *Id*. (internal quotation omitted),  In *Prometheus*, the Third Circuit censured the FCC and held that:

> Although courts owe deference to agencies, we also recognize that, "[a]t some point, we must lean forward from the bench to let an agency know, in no uncertain terms, that enough is enough." . . . For the Commission's stalled efforts to promote diversity in the broadcast industry, that time has come.  We conclude that the FCC has unreasonably delayed action on its definition of an "eligible entity"—a term it has attempted to use as a lynchpin for initiatives to promote minority and female broadcast ownership—and we remand with an order for it to act promptly.

*Id*. (internal citations omitted).

39.     The *Prometheus* decision is the backdrop to this case.  Unfortunately, because of the FCC's lack of enforcement as detailed by the Third Circuit, Comcast has been able to perpetuate its institutionalized, exclusionary and racist agenda.

40.     Major MVPDs like Comcast have unique power to limit the viewpoints available in the public media.  Program production/distribution companies, like Entertainment Studios, are reliant upon the services of such MVPDs for access to their distribution platforms not only to realize subscriber and advertising revenue, but also to reach television viewers themselves.

41.     Comcast wields control over access to its cable distribution platform.  Without such access, program production/distribution companies have, at most, very limited ability to reach the audiences served by those platforms.  The fact that Comcast has historically excluded 100% African American–owned television networks from its channel line-ups has contributed substantially to the near-extinction of 100% African American ownership in mainstream media.  That

Miller Barondess, llp
Attorneys at Law
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

1 exclusion has been, and continues to be, self-perpetuating.

2      42.     Comcast has used a variety of ploys to accomplish its discriminatory

3 ends: bogus invitations to negotiate that lead nowhere; improper insistence on

4 impermissible terms; questionable interactions with government agencies; and, more

5 recently, the creation of two paths to carriage right out of the Jim Crow playbook.

6 That approach shunts African American-owned programmers onto a hopeless,

7 supposedly African American-only, path that is a dead end.  The fact that this latest,

8 most egregious tactic has been deployed successfully with the implicit support of the

9 FCC underscores Comcast's willingness and ability to manipulate federal regulatory

10 policy in its own favor (i.e., the sham MOU process).

11 **B.    Comcast's Stated Reasons For Refusing to Contract with Entertainment**

12 **Studios Are Misleading and Untrue**

13      43.     Like many other African American–owned television networks that

14 have tried to secure cable carriage during Comcast's more than 55 year history,

15 Entertainment Studios for several years prior to filing this complaint sought carriage

16 from Comcast through the conventional process supposedly available to all network

17 suppliers.  It approached Comcast as would any programmer, describing its

18 available networks and requesting the opportunity to negotiate carriage

19 arrangements.  This led to multiple meetings over multiple years with multiple,

20 senior Comcast officials, all to no avail.

21      44.     Rather than accord Entertainment Studios carriage on the same terms

22 available to white-owned programmers—or even to negotiate with Entertainment

23 Studios at all—Comcast lied, misled and strung Entertainment Studios along, it

24 becoming clear after **more than seven years** of wasted time, effort, resources and

25 finances, that Comcast had never actually intended to do business with

26 Entertainment Studios.  Comcast officials have also repeatedly told Entertainment

27 Studios the lie that Entertainment Studios' channels are on Comcast's "short list" for

28 imminent carriage; invariably, though, Comcast has eventually denied such carriage,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

providing instead a variety of different excuses for its repeated refusals.  Comcast's persistent refusal to carry Entertainment Studios networks is all the more suspicious because those same networks are carried on Comcast's competitors' systems.

45.     Comcast has forced Entertainment Studios to play an unwinnable game of "whack-a-mole"—each time Entertainment Studios satisfied one pretextual hurdle created by Comcast, another one would pop up.  For example, senior Comcast executive Jennifer Gaiski required Entertainment Studios to present empirical data and secure support "in the field" (i.e., from Comcast regional offices and management) so that she could present such material to other Comcast senior management, Greg Rigdon and Neil Smit.  Entertainment Studios got support "in the field," but Comcast still refused to carry any of Entertainment Studios' networks, saying that "field" support now did not matter.

46.     Similarly, a representative of Comcast's overall corporate headquarters directed Entertainment Studios to garner similar support from Comcast's various Division offices in order to bolster its carriage request.  But when Entertainment Studios reached out to the different Divisions (Northeast, Central and West) for the requested support, the Divisions indicated that they "deferred to Corporate" leaving Entertainment Studios dumbfounded and perplexed – did it need to garner "Corporate", "Division", "Field" or some other type of support?  In some cases, Entertainment Studios was inconsistently advised not to meet with the field or Divisions because all carriage decisions were funneled through Comcast Corporate.  Regardless, the answer was that no matter what support it may have received from the field, Divisions or otherwise, Entertainment Studios was still denied carriage.

47.     By making all of these requests over many years, Comcast required Entertainment Studios to run around in circles—and waste hundreds of thousands of dollars on travel, marketing and other expenses—without any intention of ever considering a carriage deal with Entertainment Studios.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

48.     Comcast's lies and deceitful behavior continued with Senior Comcast executives Madison Bond and Jennifer Gaiski also telling Byron Allen, Chairman, CEO and founder of Entertainment Studios, and Janice Arouh, Entertainment Studios' President of Distribution and Marketing, during one of the many pitch meetings that took place between Plaintiff Entertainment Studios and Defendant Comcast, that Comcast would carry Entertainment Studios' networks if they were carried by Comcast's competitors.  Comcast's principal competitors, including Verizon FIOS, AT&T U-Verse and DirecTV, all carry Entertainment Studios' networks.  Yet Comcast still refused to contract with Entertainment Studios.

**The Bandwidth Lie**

49.     Comcast has used other phony excuses, in the guise of "legitimate business reasons" to justify its racial discrimination.  For example, it has on occasion claimed that it does not have "sufficient bandwidth" to accommodate Entertainment Studios' networks.  This excuse is a blatant lie.

50.     First and foremost, more than 50 MVPDs all carry Entertainment Studios' networks.  Those MVPDs run the gamut, from local cable companies to mega corporations like Verizon FIOS, AT&T U-Verse and DirecTV.  If adequate "bandwidth" is in fact a "legitimate business reason" for Comcast to exclude Entertainment Studios' networks, then it would not have been able to launch 80+ networks since 2010.  Bandwidth has not been a bar to carriage of Entertainment Studios' networks by MVPDs other than Comcast, who is the largest cable television company in the United States with an advanced, state-of-the-art platform.

**The Sports and News Lie**

51.     Comcast has also advised Entertainment Studios that Comcast is interested in providing carriage only for news and sports channels.  But Comcast has added other non-news, non-sports channels during the relevant period.  And Comcast did so while simultaneously refusing to contract, not only with either Entertainment Studios, but also with the Historical Black Colleges and Universities

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

Network ("HBCU Network"), a 100% African American–owned network focused on black college sports which would have paid the historical black colleges and universities much needed capital.  Comcast has added numerous channels since 2010, none of which are African-American owned, that are unrelated to sports or news.  These include networks such as "Baby First Americas," a parenting-related network, "Fit TV", "Outdoor Channel" and many others.  Comcast's conduct is unfortunately all too common.  Restaurant owners in this country would frequently tell African American customers that the restaurant is "booked up," even though it was painfully obvious that there was more than enough seating available.

52.     Comcast's unexplained and unsupported "bandwidth" claim is observably false.  It is merely a pretext to deny carriage to 100% African-American-owned networks.

**The Lack of Demand Lie**

53.     Comcast has also attempted to excuse its refusal to carry Entertainment Studios' networks by claiming that there is no demand for Entertainment Studios' networks.  But as previously discussed, that claim is false: Entertainment Studios' networks are carried on scores of MVPDs to nearly 80 million cumulative subscribers, many of whom are subscribers to Comcast's primary competitors.  Such extensive, nationwide carriage shows demand for Entertainment Studios' networks.

54.     Entertainment Studios' programming is currently carried on the following MVPDs (who concluded, based on sound business judgment, that there is strong consumer appeal and significant demand for Entertainment Studios' programming):

4COM, Adams Cable TV, Argent Communications, Atlantic Broadband, Bailey Cable TV, Block Communications, Cable Bahamas, Cap Cable, LLC (USA Communications), Caribbean Broadcasting Corporation, Caribbean Cable Communications, Centurytel Broadband Services, LLC, Chester Telephone Company, CIM Tel Cable Inc., Cincinnati Bell, Columbus Communications,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   Complete Communication Services, Consolidated Communications, Conway

2   Corporation, CSI Digital (Ann Arundel), Dalton Utilities, Digicel Jamaica, Digicel

3   Trinidad, Duncan Cable TV, Frontier, Geus, Great Plains, GTA Teleguam, Harron

4   Communications (Metrocast), Hawaiian Telcom Services Company, ImOn

5   Communications, Johnsonburg Community Television, Kenya/Samba, Kuhn

6   Communications, Layer 3, Lancia Digital Broadcasting Limited, Massillon Cable

7   TV, Matanuska Communications, Mayaro Cable, Media In Motion, Mid-Rivers

8   Cable Television, Mid-Atlantic Broadband, Municipal Communications Utility -

9   Cedar Falls, New Visions Communications, Norwood Light Broadband, Piedmont

10  Communications Services, RCN, Satview, Skyline Telephone Membership

11  Corporation, Suddenlink, Sweetwater Cable TV Company, The Community

12  Agency, Vermont Telephone Company, Vivicast, Vyve Broadband, Wilkes

13  Communications, Wizzie Pty Ltd, Zito Media.

14      55.     Attached as **Exhibit B** is a map of all areas in the United States where

15  Entertainment Studios' networks have carriage.  The map further reflects the fact

16  that Entertainment Studios' networks have broad, nationwide appeal by the MVPDs

17  who have contracted for these networks in all 50 states.  Moreover, as noted above,

18  MVPDs carrying Entertainment Studios networks include Comcast's biggest

19  competitors Verizon FIOS, AT&T U-verse and DirecTV.  Verizon FIOS has not

20  only renewed its carriage agreements relative to six of Entertainment Studios'

21  networks multiple times, but has added the seventh network as well.  Such

22  extensive, renewed carriage by MVPDs comparable in size, offerings and reach to

23  Comcast clearly reflects the existence of market demand for Entertainment Studios'

24  networks.

25      56.     Entertainment Studios has undertaken a survey of industry publications

26  with respect to all networks that are carried on three of the major MVPDs who

27  directly compete with Comcast—Verizon FIOS, AT&T U-verse and DirecTV.

28  Once the universe of networks common to all three of those MVPDs' line-ups was

1  identified, that universe was then compared to Comcast's network line-up.  Out of a

2  universe of 500+ networks, the survey revealed that all of the networks that are

3  carried on all three of those MVPDs are also carried on Comcast **with one glaring**

4  **exception: Entertainment Studios' networks.**

5      57.    There is one factor that distinguishes Entertainment Studios from those

6  other program suppliers is undeniable: unlike all of the others, Entertainment

7  Studios is 100% African American-owned and controlled.

8      58.    Entertainment Studios offered for Comcast to launch Justice

9  Central.TV **for free with no license fees**, but Comcast still declined to carry the

10 network.  This is further evidence that Comcast's refusal to carry Entertainment

11 Studios is based not on legitimate business reasons, but on illegal racial animus.

12 **C.    Comcast Bamboozles the FCC with Empty "Commitments"**

13     59.    White-owned media in general—and Comcast in particular—have

14 worked hand-in-hand with governmental regulators to perpetuate the exclusion of

15 truly African American–owned media from contracting for channel carriage and

16 advertising.  Congress and the Courts have, over the course of decades, repeatedly

17 signaled to the FCC their concern about the lack of diversity in U.S. media.  But the

18 FCC has nonetheless shown itself to be susceptible to various tactics that run

19 counter to those signals.  For example, the use of "token fronts" and "window

20 dressing"—African American celebrities posing as "fronts" or "owners" of so-called

21 "Black cable channels" that are actually majority owned and controlled by white-

22 owned businesses—has served to preserve that white-dominant media landscape.

23 Comcast has almost singlehandedly created those tactics.

24     60.    In 2010, Comcast proposed to acquire NBC Universal, a massive

25 transaction that raised a host of regulatory questions.  The transaction, which

26 required the approval of the FCC, was opposed by a wide range of interests, among

27 them minority-owned media companies—including Entertainment Studios—who

28 publicly criticized Comcast for its failure to do business with African American–

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

owned media companies.  Entertainment Studios (among others) urged the FCC to impose merger conditions on Comcast that would rectify Comcast's discriminatory practices in contracting for channel carriage.

61.     Faced with the possibility that its racist practices and policies might jeopardize the approval of its acquisition of NBC Universal, Comcast devised a clever way to sidestep those complaints while perpetuating its exclusion of 100% African American–owned networks.  It did so by convincing the FCC that, despite Comcast's history of discrimination, going forward, Comcast had committed to carriage of independently-owned-and-operated networks of which a majority or substantial interest was to be owned and controlled by African Americans.  Any such commitment was illusory, as has since become obvious.  But by manipulating various groups (e.g., Al Sharpton) into signing "Memoranda of Understanding" ("MOUs"), and then by submitting those MOUs to the FCC in supposed demonstration of its diversity "commitment," Comcast was able to bamboozle the FCC as Comcast has said recently that the FCC has no authority to enforce the MOU conditions which Comcast has not lived up to and the FCC has opened a "Notice of Inquiry" to investigate these violations.  Comcast's "playbook" in this regard is set forth below.

62.     Comcast gave monetary "contributions" to various non-media minority special interest groups in order to "buy" their support.  It "donated" funds to at least 54 different groups that went on publicly to endorse the Comcast/NBC Universal deal.  After buying their support, Comcast entered into MOUs with these various non-media civil rights groups, including Al Sharpton's National Action Network. Unlike Entertainment Studios, these non-media civil rights groups are not television program producers, distributors, or network owners, and do not operate in the television production or distribution business and have no expertise or true understanding in negotiating a sophisticated media MOU.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

63.     Through the MOUs, Comcast manipulated the FCC to obtain approval for its acquisition of NBC Universal.  Comcast did this by, among other things, committing to launch several new networks with minority ownership and establishing an "external Diversity Advisory Council" to advise Comcast as to its "diversity practices," including in contracting for carriage.  Through discovery in this case, it will become clear that the MOUs were a smokescreen designed to secure FCC merger approval without obligating Comcast to do business with truly African American–owned media companies and that the external Diversity Advisory Council had no power or input on network selections by Comcast, but was merely window dressing.

64.     Each of the signatories to the MOU between Comcast and the "African American Leadership Organizations" was paid by Comcast in the time leading up to the Comcast/NBC-Universal deal.  For example, Comcast paid $140,000 to Al Sharpton's National Action Network.

65.     Comcast has also paid Al Sharpton and Sharpton's National Action Network over $3.8 million in "donations" and as salary for an on-screen television hosting position on MSNBC, a Comcast owned and operated network following the NBC/Universal merger, that Comcast awarded Sharpton in exchange for his signature on the MOU.  Despite the low ratings that Sharpton's show generated, Comcast allowed Sharpton to maintain his hosting position for more than four years in exchange for Sharpton's continued public support for Comcast on issues of diversity.   By compensating Sharpton so that he and his cohorts would publicly endorse the NBC-Universal deal, Comcast was able to divert attention away from Comcast's historically, racially discriminatory carriage practices for a lot less money than it would have had to pay if it decided to carry 100% African American owned television networks.

66.     Ironically, as reported in *The New York Times*, Comcast spent millions of dollars to pay non-media civil rights groups to support its acquisition of NBC

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Universal, but it still refused to do business with 100% African American–owned media companies which would have cost Comcast much more.

67.    The MOU was signed by Comcast's then–Executive Vice President and Chief Diversity Officer David Cohen. Mr. Cohen was integral in structuring and getting the Comcast / NBC-Universal merger approved; and he was the main architect of the MOU.  He is also Comcast's chief governmental lobbyist, a major political fundraiser, and the mastermind behind Comcast's conflicts of interest and wrongdoings recounted herein.

68.    On information and belief, Mr. Cohen also oversees and signs off on the Annual Compliance Reports that Comcast submits to the FCC, in which Comcast misleadingly claims to be doing business with African American owned-and-operated television networks when, in fact, the networks Comcast has launched pursuant to the MOU are owned, controlled and backed by white-owned media and money.

69.    The "Diversity Advisory Council" Comcast established is also a sham. Not only do the Council members have limited understanding of the cable industry and little-to-no experience operating television networks, but Comcast has not given the Council any real authority to "advise" Comcast as to its diversity initiatives in contracting for carriage.  According to one of the Council members, Comcast gave the Council a standard tour of its corporate offices, and never even asked its members about channel carriage.

70.    Comcast was also able to influence and secure FCC votes in other ways.  FCC Commissioner Meredith Attwell Baker voted to approve the NBC Universal transaction and then, within a few short months, left the FCC to accept a senior executive position and a substantially higher salary at Comcast.

71.    Presented with this array of seemingly independent support, the FCC approved Comcast's acquisition of NBC Universal in 2011.  Comcast soon demonstrated that the FCC's faith was misplaced.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**D.    Comcast Fails to Comply with its MOU "Commitments"**

72.    Shortly after obtaining FCC approval, Comcast initiated a process through which African American-owned networks could apply to take one of the four network slots set aside (through the MOU) for African American-owned networks.  Two of those slots were to be filled within two years of consummation of the NBC Universal acquisition, the other two within eight years of consummation. Entertainment Studios duly applied.

73.    In 2012 Comcast announced the two networks to which it had accorded the first two African American slots.  Both were new, unknown networks with African American celebrity "fronts," who had no apparent experience in program production or distribution, no track record, and no demonstration that either was even controlled by African Americans, much less "majority or substantially" owned by them.  Both have substantial ties to white individuals and entities, including Comcast itself.

74.    One of Comcast's chosen programmers was "Aspire."  According to Comcast, Aspire is "spearheaded" by a prominent African American retired professional athlete, Earvin Johnson.  The precise nature and extent of Johnson's ownership interest are vague, even though the MOU expressly called for African Americans to hold a "majority or substantial ownership interest."

75.    Similarly, the actual locus of control of Aspire is not known to Comcast.  Only after prodding by Entertainment Studios, Aspire has disclosed that its ownership structure includes at least two types of ownership ("Common Units" and "Preferred Units"), and that white-controlled entities—UP Entertainment, LLC (formerly known as the Gospel Music Network ("GMC")), a white-owned company, and Yucaipa Funds (an entity managed by Ron Burkle, a white man)—are owners. But neither Aspire nor Comcast has disclosed the extent of the various financial contributions of the various owners, or what rights and/or powers any of the owners may hold.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

76.     Regardless of Johnson's actual ownership interest or involvement in the operation of Aspire, carriage of the Aspire network did not in any event meet the specifications of the MOU condition.  As described by Comcast, the network is operated "in partnership with [GMC]."  But the MOU condition specified carriage of an "independently-owned-and-operated" service.  Operating "in partnership with" another programmer—especially a white-owned-and-operated programmer that has historically maintained close ties to Comcast, such as GMC—cannot be said to be an "independent" operation.

77.     Aspire is a sham designed to create the false impression of compliance with the MOU while, in fact, serving as a cover to permit a white-owned, controlled and operated entity, GMC, and its owner, white-owned InterMedia Partners, L.P. ("InterMedia"), to acquire another television network.  GMC is responsible for Aspire's "advertising sales, marketing, programming, production and technical operations"—and its owner, InterMedia, also reportedly owns 33% of Aspire.

78.     Further supporting the conclusion that Aspire is a front for GMC are the facts that: (a) rather than set up its own offices, Aspire moved in and shares offices with GMC in Atlanta even though Earvin Johnson is based in Los Angeles, California; (b) according to the Application for Certificate of Authority for Foreign Limited Liability Company filed with the State of Georgia, Aspire's registered agent in Georgia is Charles Humbard, the founder, President and CEO of GMC, and a white person; (c) that application was submitted to the Georgia state government with a transmittal letter on GMC letterhead; (d) the records of the U.S. Patent and Trademark Office establish that the application for the trademark "ASPiRE" was submitted on February 17, 2012—more than two weeks after Aspire was formed, but that application was filed by GMC, not by Aspire or Johnson personally.

79.     The second of Comcast's chosen programmers for an African American slot was another unknown, not-yet-in-existence network called "Revolt" also fronted by an African American celebrity with no television production,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400      FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   distribution or network operational experience.  According to Comcast, Revolt was

2   "[p]roposed by" African American entertainer Sean 'Diddy' Combs and Andy

3   Schuon, a white man.  As is the case with Aspire, the precise nature and extent of

4   Combs's ownership interest—or anyone else's—in Revolt are vague.  According to

5   published reports, after putting up some undisclosed "starting finance," Mr. Combs

6   relied on two white sources of funding, a "financial organization called Highbridge"

7   and Ron Burkle (whose Yucaipa Funds has also been identified as an investor in

8   Aspire).  "Highbridge" refers to Highbridge Principal Strategies which, along with

9   its subsidiary, HBRV Partners, holds an investment in Revolt.  A Managing Director

10  of Highbridge is Payne Brown, who was Vice President of Strategic Initiatives and a

11  corporate officer at Comcast.  Highbridge, in turn, is a subsidiary of Highbridge

12  Capital Management, LLC, which in turn is owned by (and operates as a subsidiary

13  of) J.P. Morgan Asset Management, part of the J.P. Morgan Chase & Co.

14  ("Morgan") operation, one of whose directors is Stephen Burke, Chief Executive

15  Officer of Comcast/NBC Universal and a longtime, senior executive of Comcast.

16      80.     Having filled the first two African American network slots with Aspire

17  and Revolt with their questionable ownership and control, Comcast summarily

18  rejected all other proposals (including Entertainment Studios').

19      81.     In a separate MOU submitted to the FCC in support of its application to

20  acquire NBC Universal, Comcast made similar "diversity commitments" to the

21  Hispanic community.  After inviting and, supposedly, considering applications from

22  Hispanic programmers to satisfy those commitments, Comcast launched "Baby First

23  Americas"—a channel owned not by Hispanics, but by two Israelis–and one of

24  whose directors is the brother of Stephen Burke, CEO of Comcast/NBC Universal.

25  **E.    Comcast Twists the MOU Process to Discriminate Against Media**

26      **Companies with Truly "Majority or Substantial" African American**

27      **Ownership**

28      82.     Having established the MOU-based path to carriage reserved for

1   African American networks, Comcast has twisted that path into an invidiously

2   discriminatory, Jim Crow-like, system.  In November 2014, Entertainment Studios

3   was told by Comcast that, even though Comcast was "impressed" by Entertainment

4   Studios' networks, efforts by Entertainment Studios to secure carriage with Comcast

5   would be relegated to the MOU Process.  Thus, rather than having an additional

6   opportunity for obtaining carriage on Comcast, the only way Entertainment Studios

7   could attain carriage would be by applying for one of the two remaining MOU

8   channels set-aside for African American networks.  In the words of a Comcast

9   executive, although Entertainment Studios' networks are good enough for carriage

10  on Comcast's platform, Entertainment Studios would have to wait to be part of the

11  "next round of [MOU diversity] considerations."  Entertainment Studios would not

12  be permitted to use the normal approach available to white-owned programmers.

13      83.     The availability of a separate, African American-only track to carriage

14  appeared, at least initially, to be designed to afford more opportunity for African

15  Americans: they could enjoy a separate path set aside exclusively for them.  But

16  Entertainment Studios has since learned that, instead of viewing that separate path

17  as an additional means by which African American networks may achieve

18  carriage—over and above the normal negotiation path presumably available to any

19  network regardless of race—Comcast is now treating the MOU set-aside slots as the

20  only way by which African American-owned networks may apply for carriage.

21      84.     This is egregious racial discrimination on multiple levels.  First, as

22  demonstrated above, the MOU set-aside slots are not truly available to 100%

23  African American-owned television networks.  Comcast has demonstrated that by

24  awarding two of the four set-aside slots to unknown, previously non-existent

25  networks with African American celebrity "fronts" but whose African American

26  ownership is a puzzle, it can exclude *bona fide* African American owned-and-

27  controlled companies.  Second, even if all four set-aside slots were legitimately

28  available only to African American owned-and-controlled companies, the MOU

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

Process/set-aside carriage opportunities are themselves demonstrably inferior to the opportunities available to non-African Americans as the terms of both the Aspire and Revolt carriage agreements are, on information and belief, inferior to those of similar networks that are white owned.

85.     First the number of slots available through the MOU Process is limited: four only, two of which have already been doled out to the questionable networks, Aspire and Revolt.  The opportunity to apply for the remaining slots is limited to a particular time frame, after which the opportunity will close.  By contrast, no such limits apply to carriage opportunities available to non-African Americans. Moreover, the terms and conditions to which carriage arrangements available through the MOU Process are subject—*e.g.*, shorter carriage terms, minimal (if any) licensing fees—are themselves inferior to the terms and conditions available through the conventional approach to carriage agreements reserved for non-African Americans.

86.     The establishment of two paths for carriage that are separate—but not equal—is the very definition of discrimination. Comcast has created a Jim Crow process with respect to carriage of networks produced by media companies with "majority or substantial" African American ownership.  Instead of allowing all networks seeking carriage the same "front of the bus" access, Comcast has shunted African Americans to a separate entrance at the "back of the bus," an entrance for which Comcast has set aside a small number of inferior seats.  This is racial discrimination in contracting in violation of law.

**F.     Comcast's Discriminatory Practices Interfered with Entertainment Studios' Ability to Negotiate Carriage on Time Warner Cable**

87.     In 2015, Comcast proposed to acquire Time Warner Cable ("TWC"). At that time, Entertainment Studios was in the process of negotiating carriage of its networks on TWC's systems.  Comcast, however, interfered with those negotiations by "gun jumping" once it had the opportunity to do so.  Entertainment Studios had

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400    Fax: (310) 552-8400

made progress negotiating the terms of a possible carriage deal with TWC prior to Comcast's announced intention to acquire TWC.  But following that announcement, senior Comcast programming executive, Jennifer Gaiski, asked Entertainment Studios about its discussions with TWC; in particular, Ms. Gaiski was interested in knowing which TWC representatives Entertainment Studios was negotiating with.

88.     Entertainment Studios truthfully and transparently advised Ms. Gaiski that it had advanced negotiations with senior TWC executive Melinda Witmer . Soon thereafter, Entertainment Studios' discussions with TWC were abruptly terminated by TWC under orders from Comcast (even though Comcast did not at the time—and still does not—control TWC).  Thus, TWC delegated channel carriage by according Comcast decision-making authority before its proposed acquisition had even been reviewed by the necessary governmental authorities, itself a violation of federal law.

## G.     Comcast's History of Racial Discrimination Against Other African American–Owned Media Companies

89.     Comcast's discrimination against Entertainment Studios, as detailed herein, is part and parcel of a pattern of institutionalized racial discrimination that Comcast has perpetrated for decades.  Indeed, Comcast cannot identify a single, independent, 100% African American–owned network that it has distributed on its television platform in its 50+ years of operation except for the Black Family Channel (and aforementioned Africa Channel owned by a former Comcast executive) whose fate is detailed below.

### Black Family Channel

90.     Entertainment Studios is not the first or only victim of Comcast's blatant racial discrimination in contracting.  Before Entertainment Studios endured this discrimination, Comcast discriminated against MBC Network (later known as Black Family Channel).

91.     Black Family Channel was founded by renowned African American

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

attorney Willie E. Gary and other prominent African American entrepreneurs, including baseball legend Cecil Fielder, former heavyweight boxing champion Evander Holyfield, Marlon Jackson of the Jackson Five, and television executive Alvin James.

92.     Beginning in 2002, Comcast informed Black Family Channel that to guarantee continued carriage on Comcast's systems, Black Family Channel would need to give Comcast a significant ownership interest in the network.  When Black Family Channel refused, Comcast retaliated.  Comcast halted the expansion of Black Family Channel into new markets; it placed Black Family Channel on a more expensive, less-penetrated, less-favorable programming tier; it gave Black Family Channel inferior channel positioning; and it withdrew advertising opportunities from Black Family Channel, as explained by Alvin D. James (see **Exhibit C**.)

93.     Comcast deliberately discriminated against Black Family Channel in contracting for carriage on the basis of race.  Indeed, Comcast did not require similarly situated, white-owned networks to give Comcast an ownership interest in their networks in order to secure carriage on favorable, non-discriminatory terms.

94.     As a result of Comcast's discrimination-based retaliatory actions, Black Family Channel was placed at a competitive disadvantage and suffered severe financial harm, leading to the network's demise.  The network was eventually sold (for an undervalued price because of its dire straits) to GMC, the same white-owned network which operates Aspire.

95.     After Black Family Channel was taken over by GMC, Comcast rolled out the red carpet for the network: Comcast agreed to enter into a carriage agreement with GMC and to broadly distribute the network on its cable platform. Today, GMC's white owners are undertaking efforts to sell the network (now called Up TV) for approximately $550 million—in other words, Black Family Channel's value has increased more than 50-fold by virtue of Comcast's newfound willingness to do business with the network now that it is white-owned.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

96.     As the Black Family Channel saga shows, Comcast's treatment of Entertainment Studios is nothing new.  Comcast crushed Black Family Channel, causing the network to draft a lawsuit against Comcast in 2004 (see **Exhibit D**.  This discrimination must stop.

### HBCU Network

97.     Comcast also discriminated on the basis of race in its dealings with Historically Black Colleges and Universities ("HBCU") Network, another 100% African American–owned network. HBCU Network is a sports, entertainment and lifestyle network devoted to historically black colleges and universities.  It was created by two African American media entrepreneurs, Curtis Symonds and Clint Evans. Mr. Symonds is a cable industry veteran—he was an executive at ESPN for eight years and served as Executive Vice President, Distribution and Marketing for BET Networks for more than 14 years.  HBCU Network pledged to give back to black colleges and universities by partnering with them and sharing in the network's ownership and profits.

98.     Mr. Symonds has detailed Comcast's discriminatory dealings with HBCU Network in writing, as follows: HBCU Network met with Comcast's then–Senior Vice President of Programming, Madison Bond, and his executive team to negotiate a carriage agreement.  Comcast told Mr. Symonds that it was excited about the network and, soon after the meeting, Comcast offered HBCU Network a 20-year carriage deal, including license fees.

99.     As HBCU Network was moving forward to finalize the terms of its carriage deal, Comcast pulled the rug out from under the network: Comcast told HBCU Network that, in light of the merger between Comcast and NBC Universal, Comcast was required to launch a certain number of minority-owned networks and, even though HBCU Network had been at a very advanced stage of negotiations for carriage, it would need to start over and proceed via the application process for minority-owned networks (*i.e.*, the "MOU Process" described above).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

100.   In other words, because HBCU Network was a 100% African American–owned network, it was forced to proceed via the MOU Process rather than finalizing the carriage deal that had already been underway through Comcast's normal, white contracting process.  And, as also described above, the MOU Process led HBCU Network nowhere: Comcast eventually turned them away completely, opting instead to award the only two slots awarded thus far to "front" companies with obvious ties to Comcast (see **Exhibit E**).

## Soul Train

101.   "Soul Train" is an iconic African American–owned television series created by the late Don Cornelius, a highly successful African American television producer.  Like Black Family Channel and HBCU Network, Comcast also refused to do business with Don Cornelius Productions, a 100% African American–owned media company, that wanted to launch a Soul Train network.  Comcast shut them out, forcing them to sell the Soul Train franchise to the same white businessmen who bought the Black Family Channel at a steep, below-market discount and who are effectively controlling the Aspire network.

**H.**   **Summary**

102.   For years Comcast has engaged in an unmistakable pattern of racial discrimination in violation of the Civil Rights Act.  It has refused to deal with 100% owned and controlled African American television networks fairly; to the contrary, it has wielded its out-sized market power to the consistent economic disadvantage of minorities including African Americans.  And most recently, it has formalized its discriminatory practices through the creation of a blatantly racist, two-path approach to carriage, with the one "Blacks Only" path little more than a charade of legitimate opportunity.  These are violations of § 1981: Comcast's refusal to contract with media companies with majority or substantial African American ownership in the same manner with which it contracts with non-African American companies; its implementation of discriminatory dual paths for carriage (*i.e.*, one path for non-

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  minority-owned media and a separate, but not additional, "MOU Process"

2  supposedly for African American–owned media companies); its "award" of two set-

3  aside carriage opportunities to "front" companies; its discrimination in the

4  contractual terms it offers to African American–owned media companies; and its

5  misleading excuses for refusing to contract with 100% African American-owned

6  media.

7      103.   Entertainment Studios is being discriminated against on account of race

8  in connection with contracting in violation of the Civil Rights Act.  Without access

9  to viewers and without licensing fees and advertising revenues from the largest

10  television network distributors in the country, this 100% African American–owned

11  media business is being shut out and severely damaged.

**FIRST CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS**

**(42 U.S.C. § 1981)**

**NAAAOM and Entertainment Studios Against Comcast**

**A.**   **Section 1981**

16      104.   NAAAOM refers to and incorporates by reference each foregoing and

17  subsequent paragraph of this Complaint as though fully set forth herein.

18      105.   Comcast has engaged in, and are engaging in, pernicious, intentional

19  racial discrimination in contracting, which is illegal under § 1981.  Section 1981 is

20  broad, covering "the making, performance, modification, and termination of

21  contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

22  contractual relationship."

23      106.   African Americans are a protected class under 42 U.S.C. §1981.

24  Entertainment Studios is a 100% African American–owned media business.

25      107.   As alleged herein, Entertainment Studios attempted many times over

26  many years to contract with Comcast to carry its networks, but Comcast has refused,

27  providing a series of phony and misleading excuses.  Yet Comcast has continued to

28  contract with—and make itself available to contract with—similarly situated white-

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  owned television networks.

2      108.   Comcast has refused to contract with Entertainment Studios for channel

3  carriage and advertising.  Entertainment Studios has been deprived of the right to

4  contract with Comcast by being relegated to the MOU Process, while non-minority-

5  owned businesses have been afforded the right to contract with Comcast through its

6  normal, more accessible process.

7      109.   Comcast has dealt with Entertainment Studios and other African

8  American–owned media companies in a markedly hostile manner and in a manner

9  which a reasonable person would find discriminatory.  Comcast has a pattern and

10  practice of refusing to do business with, or offering unequal contracting terms to,

11  African American–owned media companies.

12  **B.**     **<u>Damages</u>**

13      110.   But for Comcast's refusal to contract with Entertainment Studios,

14  Entertainment Studios would receive approximately $277 million in annual license

15  fees for its seven channels—calculated using a conservative license fee of fifteen

16  cents per subscriber per month for each channel based on Comcast's estimated 22

17  million subscribers.  If Defendants contracted in good faith, Entertainment Studios

18  would also receive an estimated $200 million per year, per network, in national

19  advertising sales revenue, or a total of $1.4 billion per year, equaling a combined

20  total of nearly $1.7 billion in annual revenue.

21      111.   Combining subscriber fees and advertising revenue, Entertainment

22  Studios would generate approximately $1.7 billion in annual revenue from its

23  carriage and advertising contracts with Comcast.  Moreover, with distribution on the

24  largest cable television platform in the nation, the demand for Entertainment

25  Studios' channels both domestically and internationally would increase, leading to

26  additional growth and revenue for Entertainment Studios' networks.

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

112.   Based on the revenue Entertainment Studios would generate if Defendants contracted with them in good faith, Entertainment Studios would be valued at approximately $20 billion.

113.   Similarly situated lifestyle and entertainment media companies are valued at higher amounts.  But for Comcast's refusal to contract with Entertainment Studios, Entertainment Studios would have a valuation similar to those other media companies.

114.   Accordingly, Comcast's unlawful discrimination has caused Entertainment Studios in excess of $20 billion in damages, according to proof at trial; plus punitive damages for intentional, oppressive and malicious racial discrimination.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment, as follows:

1.   Plaintiff Entertainment Studios prays for compensatory, general and special damages in excess of $20 billion according to proof at trial;

2.   Plaintiffs NAAAOM and Entertainment Studios pray for injunctive relief prohibiting Comcast from discriminating against 100% African American–owned media companies, including Entertainment Studios, based on race in connection with contracting for carriage and advertising;

3.   Plaintiff Entertainment Studios prays for punitive damages, based on oppression and malice, according to Defendant's net worth;

4.   Plaintiff Entertainment Studios prays for attorneys' fees, costs and interest; and

5.   Plaintiffs NAAAOM and Entertainment Studios pray for such other and further relief as the court deems just and proper.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  DATED:  June 9, 2016                    Respectfully Submitted,

2                                          MILLER BARONDESS, LLP

3

4

5                                          By:  ___/s/ Louis R. Miller_____

6                                               LOUIS R. MILLER
                                                Attorneys for Plaintiffs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury pursuant to the Seventh Amendment of the United States Constitution.


DATED:  June 9, 2016                          MILLER BARONDESS, LLP



By:  _____/s/ Louis R. Miller_____
                          LOUIS R. MILLER
                          Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400